U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF VERMONT**

2022 JUL 29  PM 4: 23

CLERK

BY_____

DEPUTY CLERK

S.R.J.F., INC., Individually and on Behalf of All Others Similarly Situated,

Case No. _2:22 CV-147_

Plaintiff,

**CLASS ACTION COMPLAINT**

vs.

DAIRY FARMERS OF AMERICA, INC.

Defendant.

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.  NATURE OF ACTION ................................................................................................. 1

II.  PARTIES ................................................................................................................... 6

    A.  Plaintiff ............................................................................................................. 6

    B.  Defendants ........................................................................................................ 6

III.  JURISDICTION, VENUE, AND COMMERCE ............................................... 9

IV.  THE RELEVANT MARKETS ................................................................................ 10

    A.  Product Market ................................................................................................. 10

        1.  Raw Grade A Milk ................................................................................. 11

        2.  Processing Raw Grade A Milk ............................................................ 14

    B.  Geographic Market ........................................................................................... 16

    C.  The Northeast Dairy Market Is Highly Concentrated and DFA Exercises Market Power Within It ...................................................................................................... 19

    D.  The Northeast Raw Grade A Milk Market Has High Barriers to Entry ............... 22

    E.  Milk Pricing Background .................................................................................. 28

V.  THERE IS A LONG HISTORY OF ANTICOMPETITIVE ACTIVITY IN THE U.S. DAIRY INDUSTRY ................................................................................................... 31

    A.  DFA's Structure Incentivizes Its Predatory and Exclusionary Conduct Towards Northeast Dairy Farmers ................................................................................... 31

    B.  DFA's Pre-Class Period Collusion with Dean Foods Aided Its Efforts to Monopsonize Raw Milk ..................................................................................... 35

    C.  The Southeast and Appalachian FMMO Lawsuits ............................................. 38

    D.  DFA's Pre-Class Period Conduct in the Northeast Dairy Market and the *Allen* and *Sitts* Lawsuits ................................................................................................... 39

VI.  DFA's CONDUCT IN FURTHERANCE OF ITS MONOPSONY IN THE NORTHEAST DAIRY MARKET ............................................................................ 41

    A.  2017 – DFA Buys Cumberland Dairy Milk Producers to Control the Supply of Raw Milk to Its Bridgeton Processing Plant ....................................................... 42

| | B. | 2017 – DFA Tells Independent Dairy Farmers in the Northeast Dairy Market that It Would No Longer Market Their Milk if They Did Not Join DFA .................. 43 |
| | C. | 2019 – DFA Coerces St. Albans' Creamery Dairy Members to Join DFA .......... 49 |
| | D. | 2020 – DFA Acquires Substantially All of Dean Foods' Assets Thereby Avoiding Any Potential Competition to Supply Deans' Critical Northeast Fluid Milk Plants ............................................................................................................................. 51 |
| | E. | 2021 – DFA Signs Exclusive Supply Deal with Wakefern to Force More Independents to Join DFA ................................................................................... 57 |
| | F. | 2022 – DFA Buys GTI Transportation to Force Even More Independents to Join DFA .................................................................................................................... 58 |
| VII. | | HARM TO COMPETITION AND ANTITRUST INJURY ........................................... 59 |
| VIII. | | CLASS ACTION ALLEGATIONS ............................................................................. 65 |
| IX. | | FRAUDULENT CONCEALMENT ............................................................................. 68 |
| X. | | CONTINUING VIOLATION ...................................................................................... 71 |
| XI. | | CAUSES OF ACTION ............................................................................................... 71 |
| XII. | | REQUEST FOR RELIEF ........................................................................................... 75 |
| XIII. | | JURY TRIAL DEMANDED ....................................................................................... 76 |

Plaintiff S.R.J.F., Inc. ("Plaintiff") brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure, consisting of all dairy farmers, whether individuals or entities, who produced and sold raw Grade A milk within Dairy Farmers of America, Inc.'s ("DFA") Northeast Area region any time from at least May 10, 2016, until the present (the "Class Period"). Plaintiff brings this action for treble damages under the antitrust laws of the United States against Defendant and demands a trial by jury.

## I.    NATURE OF ACTION

1.      DFA is a dairy farmer cooperative. Its core function is to facilitate its farmer members' collective bargaining with the dairy processors that purchase their raw Grade A milk ("raw milk") for a competitive price.[1] In fact, DFA has a duty to its members to secure the highest price for their milk.

2.      But DFA expanded into dairy processing, creating an inherent conflict of interest between its members' interest in receiving the highest price for their raw milk and its processor holdings' interests in buying raw milk at the lowest price.

3.      DFA could have resolved this conflict of interest in favor of its member farmers. DFA could have run its processors to break even (it is, after all, ostensibly a non-profit organization), and structured its business model to incentivize high raw milk prices. DFA did not do that. Instead, DFA structured its business to thrive in a low-price, high-supply raw milk environment – exactly the kind of environment that benefits its processor holdings, at the expense of its member farmers' milk checks.

---

[1]      In this Complaint, raw Grade A milk excludes organic raw milk.

1

4.     DFA could pay out the profits of its processing operations to its member farmers, but it does not. DFA has hoarded that cash, using it (and a ballooning amount of debt borrowed against its members' equity) to undertake a seemingly endless series of mergers and acquisitions – fueled by a desire for what this Court recently described as "empire building." Unsurprisingly, DFA has also used that money to pay its executives exorbitant salaries, to build an extravagant $30 million headquarters in Kansas (replete with a twenty-five-foot-tall sculpture of milk and bocce and basketball courts), and to open offices in Asia.

5.     Instead, it is DFA's member farmers that are running break-even (if they are lucky) and have been operating on razor-thin margins for years. Those who are less lucky have been borrowing against the equity in their farms to stay afloat or have gone under. And because of DFA's stranglehold on the Northeast dairy market, DFA's preference for high raw milk supply and low raw milk prices has become the market reality in the Northeast. DFA's exercise of monopsony power in the purchase of raw Grade A milk impacted every dairy farmer in the Northeast, regardless of whether that farmer is a DFA member or not.

6.     Of course, DFA's empire-building does not leave room for Northeast farmers that are not DFA members any more than it leaves room for Northeast dairy processors that are not controlled, either directly or indirectly, by DFA. Over time, DFA has taken predatory and exclusionary actions to position itself as the sole conduit for Northeastern dairy farmers to get their raw milk to market, and to control Northeast raw milk processing capacity, the only market into which Northeast dairy farmers can sell their perishable product. Simply put, DFA has sought to stifle and smother all competition in the market for the purchase of raw milk in the Northeast.

2

7.     Indeed, from at least May 10, 2016, DFA attempted to or did monopsonize the market for raw Grade A milk in the Northeast.[2]  DFA did so by foreclosing Northeast dairy farmers' ability to market their milk independent of DFA, and even foreclosed farmers' ability to profitably market their milk through DFA. It achieved this foreclosure, and the consequent durable reduction in the Grade A raw milk prices received by all Northeast dairy farms, through a series of anticompetitive actions in the Northeast raw Grade A milk market. All of these actions were directed at constraining, and have constrained, Northeast dairy farmers' ability to get milk to market other than through DFA.

8.     At the cooperative level, DFA: (a) used its monopsony power to create a price environment that pushed other dairy co-operatives to the brink of insolvency, leaving those co-operatives with no choice but to join DFA through merger; (b) purchased milk-hauling fleets that served non-DFA farmers and withdrew those vital services unless those non-DFA farmers joined DFA; (c) attempted to manipulate the Federal Milk Marketing Order ("FMMO") pooling rules to both continue to set low price raw milk prices and to disadvantage DFA's non-member farmer customers; and (d) failing that, withdrew its fee-based marketing services for non-DFA members, leaving non-DFA member customers without alternative access to market unless they joined DFA.

9.     At the processing level, DFA took steps to deny independent cooperatives and dairy farms access to both DFA and non-DFA processing outlets. DFA actually removed some alternative outlets through mergers and acquisitions of non-DFA dairy processors, and DFA functionally removed other formerly independent raw milk processors by signing long-term,

---

[2]     As used herein, the Northeast geographic market is co-extensive with DFA's Northeast region, and consists of Vermont, New York, Connecticut, Rhode Island, Massachusetts, New Hampshire, Maine, New Jersey, Eastern Pennsylvania, Maryland, and Delaware. See §IV.B, infra.

3

exclusive supply agreements with those processors, at times in breach of its 1977 Consent Decree with the Department of Justice ("DOJ").

10.     The result of DFA's anticompetitive, exclusionary, and predatory conduct is that it has reinforced and extended its monopsony buyer power over the Northeast market for raw milk (measured as a % of volume marketed), from approximately 40%-55% on the eve of the Class Period to approximately 50%-60%. DFA also expanded its already large share of Northeast dairy processing capacity during the Class Period. In particular, DFA's control of Northeast fluid milk processing capacity rose to well above the 50% level courts regard to presumptively demonstrate market power. Indeed, one analyst estimates that DFA controls 85% of fluid milk processing capacity in the Northeast.[3] DFA's large share of the Northeast raw milk processing capacity provided the economic incentive to – contrary to its members' interest – exercise monopsony power in the purchase of raw Grade milk.

11.     The unique characteristics of the raw milk market facilitated DFA's anticompetitive and predatory efforts to monopsonize the Northeast market for raw Grade A milk by foreclosing dairy farmers' ability to sell their milk through or to anyone other than DFA. In particular, six characteristics of dairy production force dairy farmers to sell their raw milk near-daily, regardless of price, to a single group of buyers: (a) the need for cows to be milked twice daily, 365 days per year; (b) the extreme perishability of raw milk; (c) the cost and difficulty of transporting raw milk; (d) the lack of alternative commercial uses for raw milk apart from dairy product processing; (e)

---

[3]     Peter Hardin and Zachary Shelly, *The Northeast Dairy Dilemma: Solutions for Concentration in a Vertically Integrated Market*, THURMAN ARNOLD PROJECT AT YALE SCHOOL OF MANAGEMENT, REFORMING AMERICA'S FOOD RETAIL MARKETS: CONFERENCE COMPENDIUM (JUNE 2022), at 47.

the high costs of dairy equipment and capital stock; and (f) the lack of reasonable alternative uses for that equipment and capital stock.

12.     Most dairy farmers will go out of business within days or weeks if they cannot access a market for their raw milk.  Moreover, due to persistent high barriers to entry, some inherent to the dairy industry but others created or exacerbated by DFA's conduct, these dairy farmers cannot seek to avoid DFA's impact on raw milk prices by joining or establishing a new entrant.

13.     DFA's monopsonization was also and remains facilitated by a lack of pricing transparency and the complicated way in which milk purchase and sale prices are calculated.  As alleged in greater detail herein, although the United States Department of Agriculture (USDA) establishes monthly prices under the FMMO in the Northeast (FMMO No. 1), the FMMO-established prices serve as reference points and do not dictate what DFA (or other cooperatives) pay their members.  DFA has used this lack of pricing transparency to shield from public and farmer member scrutiny the terms on which it sells its members' milk to its own processing facilities as well as other processors.  DFA also charges its farmer members fees for the marketing services it performs without providing members with clear visibility as to what those fees are for or where those fees are going.

14.     Throughout the Class Period, as a direct and proximate result of DFA's actual or attempted monopsonization of the Northeast raw Grade A milk market, Plaintiff and the Class received lower prices for raw Grade A milk than those dairy farmers would have received in a competitive market.

15.     Moreover, given its market share and DFA's foreclosure of other profitable marketing opportunities, DFA's misconduct has negatively impacted prices paid to all farmers for

the raw Grade A milk they produce across the Northeast, including to those who market their milk through different cooperatives or independently, and those who sell their raw milk to non-DFA affiliated processors.

## II.   PARTIES

### A.   Plaintiff

16.     S.R.J.F., Inc. ("SRJF") is a New York domestic business corporation, organized and existing under the laws of the State of New York, and located in Stamford, New York.  During all times relevant to the Complaint, SRJF produced raw Grade A milk in Stamford, New York, marketed that raw milk through Defendant DFA to processors located in the Northeast, and was paid artificially depressed prices for that raw milk as a result of DFA's conduct.  At all times relevant to the Complaint SRJF was a member of DFA.

17.     As a consequence of the conduct described in this Complaint, Plaintiff and Class members suffered damages in that they received less for their sales of raw Grade A milk than they would have in the absence of DFA's attempted or actual monopsonization of the Northeast market for raw Grade A milk as alleged herein.

### B.   Defendants

18.     Defendant Dairy Farmers of America, Inc. ("DFA") is a not-for-profit corporation organized and existing under the laws of the State of Kansas, with its principal place of business at 1405 N. 98th Street, Kansas City, Kansas 66111.  DFA's Northeast Area office is located at 5001 Brittonfield Parkway, East Syracuse, New York 13057.  Pursuant to the Kansas Cooperative Marketing Act, DFA is organized as a "nonprofit, as [it is] not organized to make a profit for [itself] . . . but only for [its] members as producers."  K.S.A. §17-1602(b).

19.     DFA was formed in 1998 when Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairymen Cooperative, Inc., merged to form the largest cooperative in the United States.[4]

20.     Over the ensuing years, DFA acquired many other cooperatives, including: California Cooperative Creamery (1998), Independent Cooperative Milk Producers Association (1999), Valley of Virginia Milk Producers Association (2000), Black Hills Milk Producers (2002), Dairylea (2014), and Zia Milk Producers (2018).

21.     Today, DFA is by far the largest dairy cooperative in the United States, with approximately 14,000 members, over three thousand of which are in the Northeast.

22.     In 2018, DFA's members produced approximately 52.7 billion pounds of milk, over three times as much milk as the second largest U.S. cooperative, California Dairies, Inc., and nearly 50 billion more pounds than the second largest Northeast cooperative, Agri-Mark, Inc. That year, DFA had revenues of $13.6 billion.

23.     DFA also operates through its affiliates, joint ventures and partnerships, various milk processing plants and dairy brands across the Northeast and the United States, including: Borden, Breakstone's, Cache Valley, Friendly's, Country Fresh, Jilbert Dairy, Hotel Bar, Keller's, Lehigh Valley Dairy Farms, Meadow Gold, T.G. Lee, La Vaquita, Plugra, Kemps, LLC, Garelick

---

[4]     Indeed, as the successor to Mid-America Dairymen (and Associated Milk Producers, another of the co-ops DOJ sued in the 1970s for attempting to monopolize the market for raw milk), DFA had been bound by a 1977 Consent Decree entered by the U.S. District Court for the Western District of Missouri following the DOJ's antitrust enforcement actions. That Consent Decree enjoined DFA from engaging in much of the conduct complained of here and in recent suits against DFA – including a prohibition on DFA entering supply agreements longer than a year and coercing dairy farmers into joining DFA – from DFAs formation until June 2019, when the Consent Decree was terminated as part of the DOJ's initiative to terminate "legacy" antitrust judgments. A copy of the Consent Decree is attached hereto as Exhibit A.

7

Farms, Guida-Seibert Dairy Company, Dairy Maid Dairy, Oakhurst Dairy, Cold Front Distribution, Cumberland Dairy, LLC, and many others.

24.     DFA previously owned, operated, and controlled a milk marketing subsidiary, Dairy Marketing Services, LLC ("DMS"), a Delaware Limited Liability Company.[5]   DMS provided milk marketing services in the Northeast to its members' DFA, Dairylea (prior to its merger with DFA in 2014), and St. Albans Cooperative Creamery ("St. Albans"), and to other customers located in the Northeast, which included cooperatives affiliated with DFA and Dairylea, independent dairy farms[6] and independent cooperatives.  As part of its milk marketing services, DMS would also handle hauling, testing, marketing, balancing,[7] pricing, and invoicing.  DMS was officially absorbed into DFA through a merger in December 2018, after DFA coerced the majority of its independent customers to join DFA on the threat of losing access to a market for their milk. *See* Section VI(B) below.  DMS was the non-surviving member of the merger.

25.     Whenever reference is made to any act of any corporation or cooperative, the allegation means that the cooperative engaged in the act by or through its officers, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the cooperative's business or affairs.

---

[5]     By April 2014, DFA owned 90% of DMS. *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 443 (D. Vt. 2019).

[6]     Dairy farmers are also sometimes known as dairymen, and dairy farms (and the farmers that run them) are also sometimes known as dairies.  Throughout this Complaint, these terms are used interchangeably.

[7]     Because raw milk production is constant, but seasonally uneven, and as fluid milk is itself perishable, the industry requires processing plants that can handle varied flows of raw milk and process excess milk supply into storable products such as dried milk, butter, and cheese.   This is known in the industry as "balancing," and the plants that provide this service are known as "balancing plants."  Access to nearby balancing plants is crucial for dairy farms' and cooperatives' viability. *See* Section IV(D) below.

8

### III.    JURISDICTION, VENUE, AND COMMERCE

26.    This action arises under Section 2 of the Sherman Act (15 U.S.C. §2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26).  The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

27.    This Court has federal question subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337, and Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22, and 26).

28.    Venue is proper in this District under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

    A.    DFA marketed and purchased raw Grade A milk in this District, including from members of the Class;

    B.    In 2019, pursuant to its monopsonization or attempted monopsonization of the Northeast market for raw Grade A milk, DFA acquired a cooperative of dairy farmers, St. Albans Creamery, headquartered in this District;

    C.    As part of that same acquisition, DFA acquired and now operates Northeast Area Logistics (formerly McDermotts), a hauling company that transports raw Grade A milk, which is headquartered in this District; and

    D.    DFA processes raw Grade A milk at processing plants located in this District.

29.    DFA's conduct alleged herein was an attempt to monopsonize, or an actual monopsonization of, the market for raw Grade A milk, a product within the flow of the interstate

commerce of the United States. DFA markets, processes, ships and purchases Grade A milk across state lines. DFA makes and receives substantial payments across state lines for and from the sale of raw Grade A milk, and DFA's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States. During the Class Period, DFA used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their attempted or actual monopsonization of the market for raw Grade A milk.

30.    This Court has personal jurisdiction over DFA because DFA transacted business, maintained substantial contacts, is located, and committed overt acts in furtherance of its attempt to monopsonize, or its actual monopsonization of, the market for raw Grade A milk, in the United States, including in this District. DFA should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

31.    DFA's attempt to monopsonize, or an actual monopsonization of, the market for raw Grade A milk, and the conduct in furtherance of those aims, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## IV.    THE RELEVANT MARKETS

### A.    Product Market

32.    The relevant product market at issue in this action is raw Grade A milk. The present case concerns steps taken by DFA to obtain monopsony power over the price of raw Grade A milk. Sellers of raw Grade A milk consist of dairy farmers and their marketing cooperatives.

33.    Purchasers of raw Grade A milk consist of raw milk processing plants that use raw milk to manufacture dairy products. Those processors also compete in separate downstream processed dairy markets, where they compete to sell their processed dairy products to various

wholesale and retail customers. Those processing markets are comprised of separate sub-markets, including the market for producing fluid milk products, and the markets for producing cheese, butter, ice cream, and other non-fluid milk products. The exact contours of these downstream markets for the sale of processed dairy products are not material for the present suit. What matters is that the processors, regardless of the processed dairy product they produce, all require, and therefore compete for, the same input: raw Grade A milk. DFA's increased control over Northeast raw milk processing capacity is relevant for present purposes because these raw milk processors are the sole viable marketing outlet for Northeast dairy farmers' raw Grade A milk, and because DFA's large share of that capacity provides it with the economic incentive to exercise monopsony power in the purchase of raw Grade A milk. That is, DFA's large share of the processing capacity allows DFA to profitably suppress the price it pays dairy farmers for raw Grade A milk.

34.     The milk industry, including DFA, treat the market for raw Grade A milk, and the downstream markets for processed dairy products (sold to wholesalers and retailers), as distinct markets in the ordinary course of business. The product market for raw Grade A milk has also been treated as distinct by federal courts in prior litigation involving DFA.

### 1.     Raw Grade A Milk

35.     Raw milk is milk taken directly from the cow. Federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, and milk eligible only for manufactured dairy products, known as Grade B milk. Raw Grade A milk is raw milk[8] that meets the USDA's sanitation standards for Grade A milk processing. The only use for raw Grade A milk is for further processing into dairy products. Dairy farmers consequently have no substitute market to sell into.

---

[8]     As used herein, "raw milk" refers to Grade A raw milk.

36.     Ninety-nine percent of total U.S. milk production involves Grade A milk.  Grade B milk is not seen as a viable option for dairy farmers, who must maintain Grade A status to remain economically viable.[9]

37.     Dairy farmers milk their cows at least twice a day and must do so every day to maintain the health of their cows.  The resultant raw milk is ***highly*** perishable.  It must be received by a processor and processed within 48-72 hours from milking, or it loses its commercial value.[10] Therefore, raw Grade A milk ***must*** be transported from dairy farms to processing facilities nearly every day.  Accordingly, dairy farmers ***must*** sell their raw Grade A milk nearly every day regardless of demand, and the only possible purchasers are Grade A milk processors.

38.     This combination of constant production of a highly perishable product that has only one set of buyers leaves dairy farmers facing catastrophic financial consequences if they cannot find a buyer for their milk for just a few days in a row.  This financial risk is heightened because a dairy farm's productive assets – dairy herd, milking parlors, cow barns, calf hutches, etc. – are costly and have little to no salvage value or use outside of the dairy industry and prevent dairy farmers from readily switching to other forms of agricultural production in response to price changes.

39.     This risk is known as market access risk, and it is extremely high in the market for raw Grade A milk production.  This market access risk places Northeast dairy farmers, particularly

---

[9]     Grade B milk does not provide dairy farmers accessing to pooling, is not subject to the USDA minimum price protections, and can only be used on a limited basis for cheese and certain Class III and IV uses.  *See* ¶74 below.  Moreover, having invested to ensure their operations obtain Grade A status, there is no economic incentive to forfeit that designation and sell their milk as Grade B given it carries a far lower value.

[10]    Declaration of Gregory L. Wickham, ¶8, *United States v. Dairy Farmers of Am., Inc.*, 1:20-cv-02658, ECF No. 54-1 (Dec. 3, 2020).

small farmers, at the mercy of the cooperatives that supposedly serve them, and the processers who purchase their raw Grade A milk.

40.     Grade A raw milk is a homogenous and fungible commodity product.  One batch of Grade A milk is interchangeable with another.  Raw milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler, who transports it in insulated trucks to milk processing plants.  There the milk is typically comingled and stored together in factory sites, processors, or other collective facilities.  There is no need to, and haulers and processors do not, separate the raw Grade A milk based on the specific farmer-producer.  Moreover, because it is a homogeneous product, purchasers of raw Grade A milk make their purchase decision based on price (as one producer's product is the same as another's).  Purchasers, here dairy processors, directly benefit from a suppression of the price of Grade A raw milk.

41.     Grade A raw milk production volume is also inelastic to short-to-medium changes in price.  Because of their large, specialized capital expenditures, the long lead times necessary to adjust their dairy cow herd size,[11] the difficulty of switching to other forms of agricultural production,[12] and the perishable nature of milk, dairy farmers cannot readily adjust their output to price changes.[13]  These conditions facilitate suppression of prices paid for raw milk in the Northeast because DFA, and its processing partners, are unlikely to lose significant raw milk volumes as a result of reducing the prices they pay.

---

[11]     Gestation is nine months, and it takes two years from a calf's birth until milk production can occur.

[12]     Unlike a row crop farmer, a dairy farmer cannot simply change their crop choice each season in response to changes in available price.

[13]     Studies of Northeast raw milk supply found an estimate short-run elasticity of 0.3646 while the supply elasticity for a length of run of four years is 0.5122.

13

42.     Organic raw milk constitutes a separate product market that is clearly differentiated from non-organic raw Grade A milk. To be recognized as an organic producer, a farmer must meet specific requirements, such as those specified by the USDA's National Organic Program and undergo periodic inspection and testing. This requires significant expense, takes significant time, and cannot easily be undone. That organic raw milk is a differentiated product is evidenced by the premium at which both raw (and processed) organic milk sells over non-organic raw (and processed) milk. Therefore, organic raw milk is not a close substitute for non-organic raw Grade A milk. This case only concerns non-organic, raw Grade A milk.

### 2.     Processing Raw Grade A Milk

43.     Pursuant to the 1937 Agriculture Act, the Secretary of the USDA classifies Grade A milk into four separate classes, based upon the actual end-use of the milk:

a.     Class I milk is used in beverage milk ("fluid use") products for human consumption, including eggnog and ultra-high temperature milk;

b.     Class II milk is commonly used to manufacture "soft" dairy products, such as ricotta cheese, sour cream, cottage cheese, ice cream, yogurt, and custards;

c.     Class III milk, also known as "cheese milk," is commonly used to manufacture "hard" dairy products, like cheddar cheese, as well as cream cheese and other spreadable cheeses; and

d.     Class IV milk is commonly used to produce butter, nonfat dry milk, and skim milk powder.

44.     Milk processors process raw milk purchased from cooperatives, independent dairy farmers, or other supply plants, into dairy products for human consumption. Milk processors process milk into a variety of fluid products, as well as cheeses, ice cream, butter, milk powder, and a slew of other milk products (as reflected in the four USDA classifications noted immediately

14

above). Milk processing plants then sell the processed milk to wholesalers, further processors, and retail outlets, such as grocery stores.

45. Milk processors include independent processing plants, processors owned by dairy cooperatives or in joint ventures with dairy cooperatives, and processing plants owned by retail supermarket chains.

46. Large portions of U.S. consumers have long-held cultural and taste preferences for processed fluid milk over other beverages, and for cheese and other dairy products over other food sources. Accordingly, for that core group of U.S. consumers, demand for processed fluid milk and other dairy staples, such as cheese, is inelastic. Fluid milk and dairy products also have particular nutritional benefits and qualities for use in cooking. Retailers, supermarkets, distributors, and other fluid milk and dairy customers are unlikely to substitute other products for fluid milk and dairy products because the individual consumers they serve continue to demand them regardless of increases in price. Fluid milk's inelastic demand is also impacted by consumer's historic perception of milk as an inexpensive good, such that even when prices fluctuate, milk comprises a relatively small share of consumers' budgets.

47. There are no significant substitutes for fluid milk. Although there are potential substitute products, such as alternative "milk" products derived from plant-based sources like almonds, oats, or soybeans, the characteristics of those products lack the unique characteristics of milk. Milk is distinctive in that it can be both consumed and processed into other foods, such as cheese, milk powder, whey, ice cream, yogurt, and many others. True milk also has more protein than the alternative "milk" products, making milk a unique source of nutrition.

48. Consequently, milk processors do not have access to a close substitute for raw Grade A milk. Those who produce fluid milk are obliged by law to use raw Grade A milk, and

15

those who manufacture dairy products that could legally use Grade B raw milk are constrained by the fact that over 99% of all raw milk is Grade A.

### B.     Geographic Market

49.     The relevant geographic market for raw Grade A milk for the purposes of this case is the Northeast United States coexistent with DFA's Northeast territory,[14] comprising Vermont, New York, Connecticut, Rhode Island, Massachusetts, New Hampshire, Maine, New Jersey, Maryland, Delaware, and the majority of Pennsylvania, except for its westernmost portion (the "Northeast Dairy Market").

50.     The milk processing plants that compete to purchase raw milk produced by Northeast farmers are included in the Northeast Dairy Market.  Similarly, the dairy farms that produce the raw milk purchased by these processing plants are found in the Northeast Dairy Market.

51.     The milk industry treats this as a distinct geographic area of competition for Grade A raw milk in the ordinary course of business.  Indeed, as noted above, this geographic market is coextensive with DFA's Northeast Area region.

---

[14]     DFA is divided into seven geographic areas (Central, Mideast, Mountain, Southwest, Southeast, Western, and the Northeast).

**Figure 1.  DFA's Seven Regions**



52.     The U.S. dairy market is divided into regional geographic markets because of the high costs of transporting milk due to its weight and perishability.  Farmers do not have realistic marketing opportunities outside a day's truck drive.  Indeed, shipping costs increase by approximately $0.10 per gallon of raw milk for every additional 100 miles shipped.  Moreover, because of raw milk's perishable nature, it cannot be stored for any length of time in the hope of finding a market outside the immediate geographic vicinity of the dairy.  Milk is thus distinct from storable commodities such as grain, whose geographic markets are significantly wider.

53.     Milk produced within the Northeast Dairy Market is not regularly shipped to processing plants outside of it.[15] It is not feasible for farmers located in the Northeast to avoid a decrease in raw milk prices by shipping their milk to processors located outside the Northeast. Because processors typically purchase their raw milk under annual contracts, and as hauling, balancing, testing and other services need to be arranged in advance, dairy farmers get locked into cooperatives that control both the relationship with the processors, and the provision of the services necessary to sell milk to them (*i.e.*, hauling, balancing, and testing).  And because dairy farmers' cooperatives (and where applicable, marketing agencies such as the former DMS) have complete discretion as to where they ship their members' raw milk, dairy farmers can only hope to redirect their milk out of the Northeast if they leave their cooperative.  But because they cannot do so without a huge risk that they will not find a market for their milk, few dairy farmers do, with the result that raw milk produced in the Northeast is predominately sold to Northeast processing plants.

54.     Two geographic features of the Northeast further limit the geographic region within which raw milk can be reasonably and profitably shipped to milk processing facilities: the Atlantic Ocean to the East, and the Canadian border to the North.  Regulatory restrictions and import duties make shipping raw milk across the Canadian border problematic, and therefore Canadian markets are generally not a viable outlet for U.S.-produced raw Grade A milk.

55.     The transportation costs of shipping raw milk mean that the economic competitiveness of a Northeast dairy is dependent on its ability to transport its milk to a local processing facility.

---

[15]     For example, historically less than 1% of milk pooled in FMMO 33, which comprises much of DFA's Mideast region, was exported from FMMO 1, which compromises a significant portion of the Northeast.

18

**C.      The Northeast Dairy Market Is Highly Concentrated and DFA Exercises Market Power Within It**

56.      In 2020, the USDA's Milk Production report showed that annual milk production in the United States was about 223 billion pounds.  New York was the fourth largest milk producing state, with over 15 billion pounds of milk.  When combined with the substantial production from the other states located within the Northeast Dairy Market, Northeastern dairy farmers produced approximately 30.5 billion pounds of raw milk in 2020.  These 30.5 billion pounds represent 305 million hundredweight of raw milk and suggest that the Northeast market for the supply of raw milk is worth in excess of $5.2 billion annually.

57.      According to USDA data, from 1997 to 2017, the total number of U.S. dairy farms decreased by more than half (from 125,041 to 54,599), while the average number of dairy cows per farm more than doubled (from 73 to 175).[16]

58.      The same trends are evident in the Northeast, which has also seen widespread dairy closures and bankruptcies in recent years, and an increase in output by those dairy farms that remain.  For example, Vermont witnessed a 37% decline in the total number of operating dairy farms in the ten years preceding 2020, but a 30% increase in herd size per remaining farm.[17]  Indeed, 39 dairy farms closed in Vermont alone in 2020.[18]

---

[16]      *See* Letter from Steve D. Morris and Oliver M. Richard, U.S. Government Accountability Off., to Sen. Kirsten E. Gillibrand, U.S. Senate, at 3, GAO-19-695R Dairy Cooperatives, *Dairy Cooperatives: Potential Implications of Consolidation and Investments in Dairy Processing for Farmers* (Sept. 27, 2019), https://www.gao.gov/assets/gao-19-695r.pdf ("GAO Dairy Cooperatives").

[17]      *See* VERMONT DEP'T OF FIN. REGUL., VERMONT DAIRY INDUSTRY PRICE REGULATION: ASSESSMENT AND RECOMMENDATIONS, ACT NO. 129 (2020), at 8 (Jan. 15, 2021), https://legislature.vermont.gov/assets/Legislative-Reports/Act-129-DFR-Dairy-Pricing-Report.pdf ("Vermont Dairy Industry Price Regulation Report").

[18]      *See id.* at 13.

19

59.     There has also been tremendous consolidation of dairy cooperatives.  In 1964, there were 1,244 dairy cooperatives in the United States.  In 2017, there were 118.[19]

60.     DFA's predatory and exclusionary conduct has been a driver of the further consolidation witnessed during the Class Period.  Indeed, as explained below, through its actions to force independent farmers and cooperatives to join DFA during the Class Period, DFA has, on information and belief, increased its pre-class market share in the Northeast raw Grade A milk market from 40%-56%[20] to around 50-60% during the Class Period.

61.     DFA's increased market share is reflected in DFA's membership growth during this period.  Starting with around 2,000 Northeast member farms pre-Class Period, DFA's predatory and exclusionary conduct, in breach of its own antitrust policy,[21] coerced close to 1,000 dairy farmers and/or their cooperatives to join DFA in 2017, and several hundred between 2018 and August 2019, when an additional 340 St. Albans members were brought in addition to DFA's 3,100 Northeast members.  Since then, DFA is believed to have continued to acquire additional dairy farms.  And, as explained in this Complaint, this member growth is not the result of additional benefits or value DFA provided to attract new members, or other pro-competitive conduct that might spur voluntary confederation.  Nor was it the result of natural growth caused by new dairy

---

[19]     *Supra*, note 16, GAO Dairy Cooperatives at 3-4.

[20]     Internal DFA documents estimated its market share within its Northeast Region, which is co-extensive with the Northeast geographic market here, at 40%-56% in the period preceding 2017. *Sitts*, 417 F. Supp. 3d at 461 ("'[DFA and DMS] have calculated their own market share in the[ir] Northeast [region] as between 40% and 56% depending on the year.'").

[21]     A copy of DFA's antitrust policy is attached at Exhibit B.  Pages 3 and 7 confirm that it is against DFA's antitrust policy to "coerce or threaten a non-member producer to join DFA or to deliver milk to DFA," and that "communicating any threat or notice of contractual termination to any member, producer, hauler, or processor (except termination of a processor solely for non-payment)" can be illegal and requires prior authorization.

farms entering the market. Indeed, as noted above, there has been a decline in the number of dairy farms across the Northeast.

62.     The next largest independent Northeast cooperatives are too small individually or collectively to exercise a competitive constraint on DFA. The next closest competitors are Agri-Mark, a Massachusetts-based cooperative with approximately 900 member farms, and an annual production of approximately 3.2 billion pounds of milk (approximately 10% of raw milk sold annually in the Northeast). Beyond that is the Upstate Niagara Cooperative, based in Buffalo, New York, which has approximately 300 members and 2.3 billion pounds annually (approximately 7% of Northeast raw milk), Cayuga Marketing, from Auburn, New York, which has approximately 30 members and 1.2 billion pounds of annual production (less than 4% of Northeast raw milk), and Lanco-Pennland Quality Milk Producers, from Hagerstown, Maryland, which markets approximately 0.7 billion pounds annually (approximately 2% of Northeast raw milk). Beyond that, no independent Northeast cooperative sells more than half a billion pounds of raw milk annually in the Northeast. Importantly, of these cooperatives, only Upstate Niagara owns its own FMMO 1 fluid milk processing plant. This places these competing cooperatives at a significant disadvantage to DFA. *See* ¶75 below.

63.     The U.S. Government Accountability Office has concluded that the consolidation of cooperatives, and the rise of large cooperatives such as DFA, has resulted in "competing interests" and "power imbalances," and that "dairy cooperatives' investments in processing facilities and the mechanisms used to finance those investments" can lead to "lower earnings in the short term, while potentially reducing market access for farmers outside the cooperative."[22]

---

[22]     *Supra*, note 16, GAO Dairy Cooperatives at 3-4.

64.    Moreover, as a result of DFA's monopsonization of the Northeastern Dairy Market, there has also been significant consolidation at the processing level in the Northeast during the Class Period, as explained below in Section IV(D).

**D.    The Northeast Raw Grade A Milk Market Has High Barriers to Entry**

65.    DFA's monopsony over Grade A Raw Milk in the Northeast Dairy Market is durable because it benefits from significant barriers to entry. The primary barriers to entry at the cooperative and raw milk processing level are capital cost, risk, and market concentration (*see* Section IV(D) above). A new entrant faces a costly startup requiring significant financial investment and industry resources. New entrants are unlikely to make that investment even in response to a significant increase in raw milk or processed milk prices, as DFA has established a bottleneck through which every dairy farmer and raw milk processor must pass.

66.    DFA controls an overwhelming portion of raw Grade A milk in the Northeast Dairy Market. As noted above, upon information and belief, as little as 40% of the Northeast supply of raw Grade A milk is not controlled by DFA.

67.    DFA additionally controls a significant share of the dairy hauling capacity in the Northeast Dairy Market, either through direct ownership of the milk haulers, or through contractual relationships. It has expanded its control of hauling capacity in the Northeast through the Class Period. *See* Sections VI(C) and VI(F) below. Dairy hauling trucks are vehicles specialized to haul raw milk from a dairy to a processing plant, and for which there is no reasonable substitute. Despite Northeast independent dairy farms finding it difficult to contract for hauling services, DFA has, in recent years, been idling portions of its hauling fleet, foreclosing market access for certain producers.

68.    DFA controls a large share of the raw milk processing capacity in the Northeast Dairy Market (and the United States, generally). As noted above, this provides DFA the economic

incentive to exercise monopsony power in the purchase of raw Grade A milk. Within the Northeast, DFA and its affiliates have major raw milk processing facilities located in at least, but not limited to, St. Albans, Vermont (cream, condensed skim milk, nonfat dry milk, ice cream mix); New Britain, Connecticut (cream, ice cream mixes, fluid milk); Franklin, Massachusetts (fluid milk, cream); Wilbraham, Massachusetts (ice cream and yogurt); Frederick, Maryland (fluid milk); Portland, Maine (fluid milk, butter, buttermilk, cottage cheese, cream, flavored milk); Bridgeton, New Jersey (fluid milk, cream, ice cream); Florence, New Jersey (fluid milk, cream); Pavilion (two plants), New York (cream, skim milk, white and yellow cheddar cheese); Waverly, New York (cheese); Rensselaer, New York (cream, fluid milk); Mechanicsburg, Pennsylvania (dairy-based coffee beverages); Middlebury Center, Pennsylvania (condensed milk, cream, cream powder, malted milk powder, nonfat dry milk, skim milk powder, whole milk powder); Reading, Pennsylvania (cream, condensed milk, malted milk powder, nonfat dry milk, skim milk powder, whole milk powder); Hummelstown, Pennsylvania (dairy concentrates); Lansdale, Pennsylvania (buttermilk, cream, fluid milk, seasonal eggnog); and Schuylkill Haven, Pennsylvania (fluid milk).[23] During the Class Period, DFA acquired at least eight processing plants in the Northeast (seven from Dean Foods and the Cumberland Farms, Bridgeton, New Jersey plant). *See* Section VI(D) below.

69. DFA used the profits derived from its anticompetitive exercise of its monopsony power over raw milk prices to fund new plants that it would then exclusively supply. For example,

---

[23] DFA also operates various dairy brands and subsidiaries based in the Northeast which utilize these and other raw milk processing plants, including: Berkshire Dairy and Food Products (Pennsylvania), Friendly's (Massachusetts), Breakstone's (New York), Cumberland Dairy (New Jersey), Dairy Maid Dairy (Maryland), Garelick Farms (Massachusetts), Guida's (Connecticut), Hotel Bar (New York), Keller's Creamery (Pennsylvania), Lehigh Valley Dairy Farms (Pennsylvania), Oakhurst Dairy (Maine), and Tuscan Dairy Farms (New Jersey).

in 2016, DFA announced that it was building a cheese plant in Linwood, New York, in a joint venture, in which it held the majority stake, with Denmark-based Arla Foods and Craig's Station Ventures. The joint venture was called WNY Cheese Enterprise. Prior to its closure in or around September 2020, WNY was supplied exclusively by eight DFA-member farms in western New York.

70.     Importantly, for present purposes, DFA controls many of the balancing plants in the Northeast. While not entirely co-extensive with the Northeast Dairy Market, FMMO 1 contains eight balancing plants, five of which were owned or controlled by DFA during the Class Period.[24] As noted above, it would be nearly impossible for a new cooperative to operate in the Northeast Dairy Market without access to balancing plants, which are under the control of DFA or the other established cooperatives. *See* ¶24 n. 7. DFA, through DMS, previously offered the services of certain of these balancing plants to independent dairy farms and cooperatives, but in 2017-18 withdrew access to these independents unless they joined DFA. *See* Section VI(B) below.

71.     A new co-op seeking to compete within the Northeast must contend with these market realities.[25] Given DFA's size, any credible competitive constraint on DFA is likely to take the form of a new cooperative (as opposed to an individual dairy farmer). Forming a new cooperative would require millions of dollars in financial investment for plants, infrastructure, and

---

[24]     DFA's acquisition of the St. Albans Creamery, discussed below, added an additional balancing plant to DFA's two existing Dietrich plants, both located in Pennsylvania. DFA also controls balancing plants located in Waverly, New York and Batavia, New York through its longstanding "alliances" with Leprino Foods, a dairy processor, and O-AT-KA Milk Products, respectively. DFA is also understood to be a part owner of O-AT-KA following its acquisition of Dairylea in 2014.

[25]     The plaintiffs in *Sitts* produced evidence that as late as 2016, DFA also had in place non-compete agreements with certain Northeast cooperatives, some of whom it has since subsumed. *Sitts*, 417 F. Supp. 3d at 450 (referring to a 2016 communication in which a United Ag (Upstate Niagara) employee tells a DFA employee: "I thought that there was an arm's length agreement that we would not actively solicit your farms, nor you ours.").

24

logistics, and importantly, dairy farms willing to join it. It would be difficult to attract sufficient DFA members to join the new co-op given the long terms during which DFA members' equity is tied up within the co-operative and the difficulty of seeking its repayment.

72.    In any event, even if it has dairy farmers that wish to be independent of DFA's control, a new co-op must find a buyer for its members' milk, and DFA controls a majority of the Northeast raw milk processing capacity and has pre-existing contractual relationships with many independent processers, including exclusive or full-supply contracts. *See* ¶75 below. Moreover, the limited pool of raw milk processers outside DFA's control are unlikely to provide any relief. First, a substantial portion of the remaining raw milk processing capacity is owned by the remaining co-operatives, such as Agri- Mark, and used principally by them to process their members' milk.[26] Second, because DFA acts as a price setter within the Northeast, even those processors outside of its control do not regularly pay more for raw milk than the prices DFA establishes.

73.    Furthermore, as a result of DFA's Class Period acquisition of additional fluid milk processing plants (*see* Section VI(D) below) and its negotiation of exclusive supply agreement with other nominally independent processors previously supplied by independents (*see* Section VI(E) below), DFA has further entrenched its large share of the Northeast raw milk processing capacity. A dairy farmer's (or their cooperative's) ability to market their raw Grade A milk to a fluid milk processing plant is crucial, as their ability to participate in the USDA milk marketing program, and benefit from the minimum blend prices (discussed in Section VI(E) below), is

---

[26]    Note, all of four of Agri-Mark's Northeast plants are non-fluid milk plants, and are focused on butter, cheese, and whey production. *Supra*, note 17, Vermont Dairy Industry Price Regulation Report at 14 (noting Agri-Mark processes 70%-80% of its members' milk at its four Northeast processing plants).

dependent on their ability to deliver certain minimum quantities of raw milk to participating fluid milk processors or pool plants each month (known as "touching base").

74.    Upon information and belief, at the time of filing, DFA controls at least 50%,[27] and perhaps as much as 85% of the fluid milk processing capacity in the Northeast Dairy Market once its existing supply agreements with nominally third-party processors, such as HP Hood, part owned by DFA, are considered.  This control of Northeast processing plants that process raw Grade A milk into fluid milk is in addition to DFA's large share of other Northeast dairy processing plants that process raw Grade milk into Class II, II, and IV dairy products, such as cheese, yogurt, cream cheese, butter, whey, and powdered milk. *See, e.g.*, ¶68.

75.    In the *Sitts* litigation, the Court found that in 2016 35% of DFA's Northeast members' total milk was sold to processors Dean Foods, HP Hood, and Kraft, and that the plaintiffs in that case had presented evidence that DFA had both full or exclusive supply agreements with those processors' Northeast plants that included most-favored nation pricing, which contributed to the suppression of milk prices.[28]  Indeed, as recently as April 2018, DFA entered into a series of full-supply agreements with HP Hood relating to their Northeast plants with a term of ten years, and a two-year, full-supply agreement with Dean for its Lansdale, Pennsylvania plant in February 2017, in breach of the Consent Decree.[29]  On information and belief, Plaintiff alleges that DFA

---

[27]    *See, e.g.*, Complaint at 1, *United States v Dairy Farmers of Am. and Dean Foods Company*, 1:20-cv-02658 (N.D. Ill. May 1, 2020), ECF No. 1 ("DOJ DFA Dean Foods Complaint"), https://www.justice.gov/atr/case-document/file/1279226/download (noted DFA's acquisition of Deans' New England fluid milk processing plant would leave DFA with "over 50%" of the fluid milk capacity in New England states alone).

[28]    The plaintiffs in the *Sitts* litigation presented evidence that DFA has had full supply and raw milk outsourcing agreements with Hood's Northeast plants from 2005 until at least 2019. *Sitts*, 417 F. Supp. 3d at 443-44, 453-57.

[29]    *Id.* at 456-57.

has, consistent with its pre-Class Period conduct, procured other long term, full-supply agreements with other supposedly independent Northeast Grade A raw milk processes, likely to contain most-favored nation pricing.

76.     And even if the new co-op has members and buyers, it must find independent haulers willing to ship its milk.  To do so, notwithstanding DFA's idling of capacity, the cooperative must have sufficient raw milk to offer the haulers to make the account economically viable.

77.     The consequence of these significant barriers to entry is that there would be no timely entry of new dairy cooperatives in the Northeast in response to small but significant and non-transient increases in raw milk prices.

78.     For a new processor to enter and act as a competitive constraint on DFA's monopsony power, it must secure a supply of raw milk.  This is difficult as DFA controls all but 40-50% of raw milk in the Northeast, and, as of January 2021, markets approximately 50% of its members' raw milk to DFA-owned or -affiliated processors in the region.  In any event, the new entrant could not rely upon DFA to market raw milk to it on terms comparable to the prices DFA sets for raw milk sold to its own processors and to its full-supply partners, such as HP Hood. Consequently, the new entrant will operate at a significant disadvantage to DFA and its existing partners unless they obtain raw milk from a non-DFA source.  This historical lack of new entrants into the Northeast processing market confirms the effectiveness of these deterrents.

79.     And even if a processor can find an independent supply of raw milk, and an independent hauler, it still must come up with a massive capital outlay.  For example, building a new fluid milk processing plant requires an investment of at least $250 million.  *See* Section VI(E) below.

27

80.     DFA's anticompetitive, exclusionary, and predatory conduct, described more fully below, combined with the high switching costs faced by DFA members and the high barriers to entry faced by new cooperatives and raw milk processors, enabled DFA to obtain and maintain its durable monopsony over the Northeast raw Grade A milk market.

**E.     Milk Pricing Background**

81.     There is an old adage in the dairy industry: "only five people in the world know how milk is priced in the U.S., and four of them are dead."  Milk pricing in the United States is among the most complicated commodity pricing regimes in all of agriculture.  Therefore, the following is only a summary of the facts pertinent to this Complaint.

82.     Congress established the Federal Milk Marketing Order or FMMO system in the 1930s in an attempt to return some market power to farmer-producers from the entities that previously purchased their raw milk.  Under the FMMO system, for each of the eleven regional marketing areas, the USDA calculates monthly minimum prices according to its formula for raw milk sold pursuant to its regulatory regime.

83.     The Northeast FMMO No. 1, covers all of Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island, New Jersey, and Delaware, the vast majorities of New York, and Maryland except the westernmost portions of those states, the southeastern portion of Pennsylvania, and a very small portion of northern Virginia.  As noted elsewhere, this Complaint focuses on the actual prices that dairy farmers receive for raw milk in the Northeast, so although there is overlap, the Northeast FMMO is not the geographic market at issue in this case.

84.     The USDA price formula uses classified component pricing, whereby Grade A raw milk is priced at different levels based on the demand characteristics of the four categories downstream of use identified in ¶43 above.  In general, but not always, raw milk that is processed into Class I fluid milk receives the highest price.  Conversely, raw milk used to produce Class III

(cheese) and Class IV (butter, milk powder) products typically receives lower prices, and these products perform a market clearing role as the resultant products are typically less perishable and more readily transported, and thus can be stored and held until demanded.[30]  These monthly USDA class prices represent the minimum prices that privately-owned milk processors must pay for such milk marketed pursuant to USDA regulation.

85.     These minimum prices are less than the dairy farmer's cost of production.  The farmer, or co-operative acting on its behalf, must negotiate a premium above these minimum prices to remain profitable.  These are referred to as "over-order premiums," and should reflect supply and demand conditions.  While over-order premiums are potentially payable by all processors, they are typically higher for Class I milk.  This reinforces the importance of a dairy farm having access to fluid milk processing plants.

86.     The USDA also publishes monthly "blend" prices for each FMMO, referred to as the Statistical Uniform Price.  This represents the weighted uniform average of the classified prices of all the raw Grade A milk that is "pooled" in an Order (*i.e.*, sold pursuant to the USDA regulations).  This accounts for the different end uses to which the raw milk is put to in the region, and the fact that raw milk is typically comingled before being processed.

87.     But cooperatives like DFA are not required to pay their members the FMMO minimum "blend" price regardless of whether the cooperative does or does not pool milk for a given month pursuant to the USDA regulations, or whether or not that cooperative secured an "over-order" premium on behalf of its members.  Instead, dairy cooperatives like DFA may pay

---

[30]     As noted above, milk production is seasonal, with cows tending to produce more milk in the spring.  Sales of dairy products are also seasonal.  For example, cheese and butter consumption peak in the winter months, while fluid milk consumption is larger during school terms.  Access to processing plants producing Class III and IV products, some of which function as balancing plants, is therefore critical to dairy farmers seeking to manage these seasonal variations.

their producer members in whatever manner the cooperative determines. Under the regulatory regime, DFA is permitted to, and in fact does, first deduct various costs and expenses of its own making from the sums negotiated with the regional processers (including itself), before paying its members via their monthly milk check. That is, the USDA does not set the prices cooperatives like DFA pay to their members and these cooperatives, including DFA, get to pay themselves first before paying their members. As DFA and other cooperatives deduct all their "costs" from the price paid by the processor first, every dollar by which processor prices are suppressed results in a dollar less of value available to the dairy farmers.

88.     Although DFA's members' monthly pay statements sometimes break out certain purported costs and expenses that DFA deducts, the calculation is nebulous at best. DFA does not share with its members specific information on, among other matters, what price DFA received for the milk it sold each month, specific terms of contracts or agreements with customers (including often enough, the cooperative's own subsidiaries, affiliates, or joint ventures), and/or any breakdown of how the various costs and expenses are determined or what the members' money specifically went to.

89.     Based on DFA's national sales figures, which are all that is available, DFA's Annual Reports show that DFA's Average Sales Price (per cwt) remained consistently between $5.00 and $6.00 more per cwt than the average price paid to member-farmers between 2015 and 2018. That gap jumped to over $6.00 in 2019, and to over $10.00 in 2020:

30

**Table 1. Average Sales Price Received by DFA and Average Price Paid to Members**

| Year | Average Sales Price ($ Per Hundredweight) | Average Price Paid to Members ($ Per Hundredweight) | Difference |
|---|---|---|---|
| 2015 | 22.26 | 17.18 | 5.08 |
| 2016 | 21.61 | 16.22 | 5.39 |
| 2017 | 22.81 | 17.57 | 5.24 |
| 2018 | 21.13 | 16.04 | 5.09 |
| 2019 | 24.75 | 18.46 | 6.29 |
| 2020 | 28.29 | 17.79 | 10.50 |
| Average across 2015-2020 | 23.48 | 17.21 | 6.27 |

90.     There is no accounting for these large gaps between the price received by DFA for raw milk and the price paid to members. This precludes DFA's members from access to critical market information. DFA holds a significant advantage over its members as it has easier access to resources and market information.

## V.     THERE IS A LONG HISTORY OF ANTICOMPETITIVE ACTIVITY IN THE U.S. DAIRY INDUSTRY

### A.     DFA's Structure Incentivizes Its Predatory and Exclusionary Conduct Towards Northeast Dairy Farmers

91.     As noted already, DFA divides its business into two segments. The first is "Milk Marketing," which directs the marketing of DFA's member-producers' milk. The second is "Commercial Investments" or "Commercial Operations" which consists of a nationwide network of DFA-owned or DFA-controlled dairy product manufacturers that process raw Grade A milk into value-added dairy products.

92.     DFA's Commercial Investments segment participates in joint venture partnerships and affiliate relationships with leading food manufacturing companies.[31] *See also* ¶69.

---

[31]     *See Sitts*, 417 F. Supp. 3d at 443.

93.     DFA's "Milk Marketing" and "Commercial Investments" business segments are inherently conflicted. The Milk Marketing segment should, under normal circumstances, seek to obtain the highest possible price for DFA's member-farmers' milk. The Commercial Investments segment, however, benefits from lower raw milk prices, because those operations use raw milk as an input. Simply put, DFA's Commercial Investments business segment is more profitable when raw milk prices are lower.

94.     DFA has recognized this conflict. For example, in an October 2000 memorandum, DFA's subsequent CEO Rick Smith (who retired from that position effective June 30, 2022) wrote to DFA's then-CEO, Gary Hanman, that "just like in operating fluid plants, there is a conflict of interest in selling your own milk to your own manufacturing facilities."

95.     In another lawsuit, Smith testified that when operating a fluid milk plant, one wants to buy raw milk at the cheapest price, but a cooperative acting on behalf of its farmers selling raw milk would want to sell the raw milk at the highest possible price.[32]

96.     DFA's 2018 and 2019 Annual Reports also acknowledge this conflict, explaining that: "[t]he profitability of our [commercial] affiliates can be impacted by the price of raw milk."

97.     DFA has structured the payments it takes from dairy farms to embrace, perpetuate, and profit from this conflict of interest, thereby permitting it to profitably exercise monopsony power. DFA's Milk Marketing segment charges members a fixed amount per cwt sold, regardless of what price DFA negotiates (often with itself) for its members' raw milk.[33] Thus any decreases

---

[32]     *See id.* at 458.

[33]     As of 2017, DFA's marketing fee charged to its members had been fixed at $0.10 per cwt for at least 10 years. Declaration of Margaret M. Zwisler, Exhibit 2, *Sitts*, 2:16-cv-00287 (D. Vt. Mar. 6, 2019), ECF No. 116-2 (excerpt of Professor Elhauge's expert report noting that DFA's income statements show "that its net income from the sale of members' raw milk has been a fixed 10.00 cents per cwt for at least the least ten years," citing financial statements from 2008 through November 2017).

in the market price for raw milk inure to DFA's members, not DFA, and not its raw milk processing arms.

98.     Moreover, because DFA's Milk Marketing segment charges a fixed per cwt fee, regardless of price, DFA's Milk Marketing segment is incentivized to bring as much milk to market as possible. More volume means more fees for DFA, even if the price-depressing impact of milk oversupply is contrary to the ostensible goal of DFA's Milk Marketing segment and the interest of DFA's members.

99.     As for DFA's Commercial Investments segment, whose main input cost is raw milk, it is obvious that reducing raw milk prices directly increases this segment's profit.

100.    Thus, DFA as an entity financially benefits from reducing raw milk prices while maintaining as much raw milk volume as possible.

101.    DFA has therefore taken actions to perpetuate this high volume / low price dynamic. Indeed, DFA has attempted to promote a raw milk oversupply in the Northeast in the Class Period to coerce independent dairy farms and cooperatives to either cease operations or join DFA in response to the low milk prices and reduced marketing opportunities DFA has engendered. To do this, DFA has encouraged its members to expand production and has used its financing arm to extend them the credit to do so during the Class Period.[34] By contrast, in recent years other co-

---

[34]     Nate Wilson, *There Could Be a Lot of Spilled Milk*, THE POST-JOURNAL (Feb. 26, 2017), https://www.post-journal.com/opinion/local-commentaries/2017/02/there-could-be-a%E2%80%88lot-of-spilled-milk/ ("While other large handlers in the [Northeast], in an attempt to rein-in overproduction, have put their producers on notice that they will not guarantee the Statistical Uniform Price for milk production exceeding traditional base norms . . . . DFA has a subsidiary, DFA Finance, working closely with First Financial Bank, to advance loans to DFA member farms to expand milk production in FMMO 1, fueling further overproduction.").

operatives such as Agri-Mark proactively sought to manage their members' production levels.[35] DFA only belatedly considered such steps during the height of the COVID pandemic.

102.    DFA's payments to its member-farmers for their raw Grade A milk have remained consistently low, even while the cooperative enjoys record revenue from its commercial divisions (*see* ¶89 above). Very little of DFA's raw milk processing-side profits make their way back to their member dairy farmers. For example, in 2020, DFA as an entity enjoyed EBITDA of approximately $515 million, yet DFA reported that it only paid its member-farmers $46 million, or just 8.9% of DFA's EBITDA.

103.    DFA is exploiting its buyer power over its members and other dairy farmers to obtain cheap raw milk for itself and its raw milk processing partners and failing to pass on the increased commercial revenues to its farmers. DFA does so because it privileges its commercial division (and its executives) over its members and other dairy farmers, a fact made explicitly known by its September 2017 presentation to Moody's, which listed "grow our commercial businesses" as one of DFA's six topline goals but did not list growing farmer pay prices.[36] DFA therefore chose to retain annual earnings to fund the expansion of its commercial operations in manners that do not benefit dairy farmers, rather than return those funds to the farmers as

---

[35]    Anna-Lisa Laca, *Dairy Report: Agri-Mark Co-op Begins $5 Per CWT Overproduction Penalty*, DAIRY HERD MANAGEMENT, October 22, 2019, https://www.dairyherd.com/news-news/business-news/business-markets/milk-prices/dairy-report-agri-mark-co-op-begins-5-cwt ("Beginning in January [2020], [Agri-Mark] producers will receive less money for their milk if they produce more than their contract allows. . . . Each farm will receive a base production level based on their highest volume of milk sold over the past three years. Anything above the base will be penalized.").

[36]    Declaration of Margaret M. Zwisler, Exhibit 2, *Sitts*, 2:16-cv-00287, (D. Vt. Mar. 6, 2019), ECF No. 116-2.

patronage.[37]  This "empire building" is not in the best interests, in the short or long term, of its member-farmers.[38]

104.   Moreover, by paying dairy producers less, DFA is able to present its annual performance as stable and continuously profitable, thereby portraying its management as successful leaders worthy of high compensation and bonuses.

105.   DFA's executives are frequently conflicted, being not only the highest-ranking employees of the cooperative themselves, but also serving on the boards of and/or working for or with joint ventures and even competitors.  Upon information and belief, these executives receive outsized compensation for serving in these various capacities, and their incentive pay structures are tied to increasing DFA's raw milk production and/or processing profits, and not increasing member pay.

**B.      DFA's Pre-Class Period Collusion with Dean Foods Aided Its Efforts to Monopsonize Raw Milk**

106.   Around the time DFA came into existence in 1998, Texas-based dairy company Suiza Foods ("Suiza") was the largest fluid milk processor in the United States.  At the same time, the old version of Dean Foods ("Old Dean"), was the second-largest buyer of raw milk and the second-largest bottler of processed milk in the United States.

107.   In 2001, DFA was supplying raw milk to Suiza, while independent dairy farmers supplied raw milk to Old Dean.

---

[37]      *Id.*

[38]      *Sitts*, 417 F. Supp. 3d at 459 (Court concluded at summary judgement that "Plaintiffs proffer admissible evidence from which a rational jury could conclude that DFA management favored growth of its commercial operations and empire building over the interests of its farmer-members.").

108.    In 2001, Suiza and Old Dean announced plans to merge and operate under the merged name of Dean Foods Company. In reviewing the proposed merger, the DOJ expressed concerns relating to post-merger competition: (1) the need for open competition for the supply of raw milk to the newly-created milk processing company; and (2) the need for Dean Foods to divest certain plants to preserve competition at the milk processing level.

109.    The first concern was driven both by an analysis of the then-current state of competition among milk producers, as well as by the fact that DFA was party to the 1977 Consent Decree. The Consent Decree restrained DFA from entering into contracts for the sale of raw milk with a duration in excess of one year. *See* Exhibit A.

110.    To avoid this limitation, the parties to the Suiza-Dean merger made a deceptively limited presentation to the DOJ by disclosing a series of milk supply contracts between DFA and Dean Foods. Those contracts were for one-year terms that would be renewed in successive years if not terminated by the parties. The contracts also contained "competitive pricing clauses" that would allow Dean to purchase milk from lower-cost providers.

111.    However, the parties to the Suiza-Dean merger hid from the DOJ that they had also entered into an unlawful separate agreement – a promissory side note – that imposed the very restriction on competition for raw milk purchases the parties said did not exist. On December 21, 2001, Dean Foods issued a contingent, subordinated promissory note to DFA in the original principal amount of $40 million. This "Side Note" had a 20-year term that bore interest based on the consumer price index. Interest would not be paid in cash, but rather, would be added to the principal amount of the note annually, up to a maximum principal amount of $96 million. This Side Note would become payable only if Dean Foods materially breached or terminated its milk supply agreement with DFA without renewal or replacement. Otherwise, the Side Note would

expire in April 2021, without any obligation to pay any portion of the principal or interest. In other words, the Side Note effectively created a penalty of $40 million to $96 million if Dean Foods did not purchase all its raw milk from DFA should DFA elect to supply it, notwithstanding the terms of the relevant supply contracts.[39]

112.    In exchange for this Side Note the parties created a new company, controlled by DFA, which would own the milk processing plants divested by Suiza-Old Dean in connection with the merger. The parties then also entered into an illegal non-compete agreement pursuant to which DFA agreed that the divested plants would not compete vigorously with the processing plants retained by the new Dean Foods.

113.    As a result of this second agreement, at the same time the merging parties were holding these processing plants out to the DOJ as viable plants that would preserve competition, they had secretly agreed not to compete against each other.

114.    The net effect of the agreements, both public and private, between DFA and Dean Foods, was that DFA agreed not to compete with Dean Foods at the processing level in exchange for full supply rights to the combined company for 20 years, until 2021. On information and belief, DFA exercised its right to be full supplier to certain Dean processing plants during the Class Period. Indeed, the Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA"), has detailed in a separate complaint how DFA used its full supply rights to foreclose

---

[39]    Also, in 2007, a class of retailers filed a lawsuit alleging that DFA and Dean had violated Section 1 of the Sherman Act by, among other things, entering into the illegal side agreements in the Suiza/Old Dean merger as alleged above. *See Food Lion v. Dean Foods Co.*, No. 2:07-cv-188 (E.D. Tenn.). This matter settled on undisclosed terms in March 2017.

MDVA from continuing to supply raw milk to Dean Foods' former Carolina plants across 2014 to 2019.[40]

115.    With the side note due to expire in 2021, raw milk sellers across the country looked forward to again being able to compete on the merits to supply Dean Foods' processing plants, including those in the Northeast.   However, the end of this exclusive supply agreement, and renewed competition on the merits to supply Dean Foods facilities, never came.   As discussed below, *see* Section VI(D), Dean Foods declared bankruptcy in 2020, with the majority of its fluid processing facilities being sold to DFA.

116.    DFA's and Dean's anticompetitive, exclusionary, and predatory conduct, designed to foreclose competition in raw Grade A milk markets across the country, resulted in successful antitrust class litigation in the Northeast, Southeast, and Appalachian FMMOs, as described below. Moreover, throughout the Class Period, it enhanced and entrenched DFA's monopsony power over the Northeast market for raw Grade A milk.

## C.    The Southeast and Appalachian FMMO Lawsuits

117.    In *Sweetwater Valley Farm, Inc. v. Dean Foods Co.*, No. 2:07-cv-208 (E.D. Tenn.),[41] a class of dairy farmers alleged that DFA, Dean, and other dairy marketing service providers conspired to control the milk supply chain and prices for milk in the Southeast and Appalachian FMMOs by requiring farmers to use DFA-controlled marketing agencies in exchange for access to processing plants.   This behavior, coupled with other misconduct, harmed independent cooperatives and raw milk processors.

---

[40]     Complaint, ¶¶61-2, *Food Lion, LLC v. Dairy Farmers of Am., Inc.*, 1:20-cv-00442, (M.D.N.C. May 19, 2020), ECF No. 1

[41]     Later re-captioned *In re Southeastern Milk Antitrust Litigation*, MDL No. 1899 (E.D. Tenn.).

118.    The Southeast plaintiffs alleged that DFA and the other defendants operated "an unlawful cartel that refuse[d] to compete for the purchase of Grade A milk," that "foreclose[d] access to fluid Grade A milk bottling plants and processors," and that "fixe[d] prices for Grade A milk paid to Southeast dairy farmers." *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 937 (E.D. Tenn. 2008). The plaintiffs alleged that DFA controlled 90% of the Grade A milk produced in the Southeast, and that it owned and operated its own hauling companies, processing plants, and distribution centers. *Id.* at 938.

119.    The Court denied the majority of the defendants' motions for summary judgment. *See In re Southeastern Milk Antitrust Litig.*, 801 F. Supp. 2d 705 (E.D. Tenn. 2011). Shortly after that decision, the plaintiffs reached a $140 million settlement with Dean Foods. *See In re Southeastern Milk Antitrust Litig.*, No. 2:08-md-1000, 2011 WL 3878332 (E.D. Tenn. Aug. 31, 2011). The class plaintiffs later reached another settlement worth $158.6 million with DFA and certain other defendants in 2013. *See In re Southeastern Milk Antitrust Litig.*, No. 2:08-md-1000, 2013 WL 2155379 (E.D. Tenn. May 17, 2013).

120.    The existence and success of the *Southeastern* litigation underscores the recidivist nature of DFA's misconduct, as well as DFA's nationwide control over raw Grade A milk.

### D.    DFA's Pre-Class Period Conduct in the Northeast Dairy Market and the *Allen* and *Sitts* Lawsuits

121.    In 2009, another class action was filed by farmers, this one concerning the Northeast FMMO, *Allen v. Dairy Farmers of America*, No. 2:09-cv-230 (D. Vt.). The plaintiffs alleged that DFA's marketing agent (DMS), acting on behalf of DFA, marketed around 80% of the milk marketed to bottling plants in the Northeast on behalf of 9,000 Northeast dairy farmers.[42]

---

[42]    *See Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 330-31 (D. Vt. 2010).

122.    The plaintiffs alleged that DFA created both monopsony and monopoly power in the Northeast's milk distribution system by tying up access to fluid milk processing/bottling plants in the Northeastern United States through unlawful exclusive supply agreements and then using that monopsony power to force independent farmers to join DFA or to market their raw milk through DMS. Having secured that dominant market power, DFA used that power "to reduce fluid raw milk prices paid to its members and other class members relative to what would have prevailed in a competitive market," thereby resulting in higher profits to DFA and for DFA's customers, with whom DFA conspired. The plaintiffs further alleged that the monopsonization/monopolization conspiracy "eliminated competition by and between Defendants" and "fixed at artificially low levels" the fluid raw milk prices that farmers would otherwise receive in a competitive market.[43]

123.    The Court denied the defendants' motion for summary judgment, concluding, *inter alia*, that "Plaintiffs have cited sufficient evidence of the alleged conspiracy's anticompetitive activities to survive summary judgment. This evidence includes the use of full supply agreements and most favored nations clauses, sizable payments for non-competition for certain independent suppliers, evidence of uniformity of prices, evidence that over-order premiums were higher in other markets, the sharing of pricing data among competitors, and evidence that dairy farmers did not readily shift their cooperative or processor affiliations . . . ." *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2014 WL 2610613, at *14 (D. Vt. June 11, 2014).

124.    The class in *Allen* eventually settled for $30 million with Dean in 2011 and $50 million with DFA in 2013. *See Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2016 WL 3208947 (D. Vt. June 7, 2016). The class settlement in *Allen* also included various forms of

---

[43]    *Id.*

injunctive relief, including, *inter alia*: (a) precluding DFA from entering into any new full-supply agreements for the sale of raw Grade A milk in FMMO No. 1; (b) imposing restrictions on DFA's ability to terminate marketing agreements with its members and affording those members additional rights concerning termination; (c) establishing farmer representative positions, including a "Farmer Ombudsperson" in the Northeast; (d) mandating the release of certain information upon request; (e) requiring DFA to be more financially transparent; and (f) establishing an Audit Committee of the DFA Board.

125.    A group of 116 dairy farmers who opted out of those settlements in *Allen* continued to pursue their claims in *Sitts v. Dairy Farmers of Am., Inc.*, No. 2:16-cv-287 (D. Vt.), filed on October 26, 2016.  The *Sitts* opt-out action settled on the eve of trial in autumn 2020, for undisclosed terms.

126.    The situation in the Northeast is now worse than it was at the time of the *Allen* or *Sitts* settlements.  Indeed, DFA has tightened its stranglehold on the Northeast Dairy Market through further predatory, exclusionary, and anticompetitive conduct.

## VI.    DFA'S CONDUCT IN FURTHERANCE OF ITS MONOPSONY IN THE NORTHEAST DAIRY MARKET

127.    Undeterred by the *Allen* or *Sitts* settlements, DFA has doubled down on increasing its buyer power over Northeast raw Grade A milk.

128.    DFA has continued to take actions that coerce dairy farmers in the Northeast Dairy Market to join DFA by foreclosing their ability to find a reliable market for their milk outside of DFA.  DFA has engaged in exclusionary and predatory behavior to foreclose market access and stifle competition through a multi-faceted approach that has encompassed the entirety of the Grade A raw milk supply chain, including acquiring alternative avenues for dairy farmers to get their milk to market (*i.e.*, competing dairy co-operatives), excluding independents from its milk

marketing services (*i.e.*, the withdrawal of DMS's marketing services), acquiring the actual means by which dairy farmers get their milk to market (*i.e.*, dairy haulers), or acquiring the markets themselves (*i.e.*, milk processors) and/or locking them up through exclusive or full-supply supply arrangements (*see* ¶75, above).

129.    Each subsequent action has reinforced DFA's control over raw Grade A milk prices and Northeast dairy farms' milk marketing opportunities and has facilitated DFA's ability to foreclose would-be competitors.  This snowball effect has entrenched DFA's monopsony buyer power in the Northeast raw Grade A milk market.

130.    Continuing a pre-Class Period theme, acknowledged in *Allen* and throughout industry publications, DFA's acquisition targets were often in financial distress as a consequence of the market conditions DFA had engineered.  Like the arsonist taking credit for putting out the fire, DFA has sought to spin its actions as saving or stabilizing the Northeast Dairy Market it was hellbent on bleeding to death.  The result of DFA's price setting actions is that Grade A raw milk prices paid by processors across the Northeast have been artificially suppressed.

### A.    2017 – DFA Buys Cumberland Dairy Milk Producers to Control the Supply of Raw Milk to Its Bridgeton Processing Plant

131.    In November 2017, DFA bought Cumberland Dairy Milk Producers in Bridgeton, New Jersey.  Prior to its acquisition by DFA, Cumberland Dairy was a family-owned dairy processor of ultra-pasteurized products that sourced its Grade A raw milk from multiple suppliers.

132.    Cumberland Dairy's Bridgeton, New Jersey, processing plant produces millions of gallons of ultra-pasteurized dairy products annually. Speaking of this acquisition (and several other DFA acquisitions of processers that proceeded it), Alan Bernon, then DFA's Senior Advisor of

Mergers and Acquisitions, testified that it was in the best interest of Cumberland Dairy, and DFA' s other processors, to pay the lowest price for the best quality of raw milk.[44]

133.    And post-acquisition, DFA has ensured a steady flow of cheap Grade A raw milk to Cumberland Dairy and its other processers.  Indeed, upon information and belief, post-acquisition, all, or nearly all, of the raw Grade A milk used by Cumberland Dairy's Bridgeton processing plants is provided by DFA.

## B.    2017 – DFA Tells Independent Dairy Farmers in the Northeast Dairy Market that It Would No Longer Market Their Milk if They Did Not Join DFA

134.    Prior to 2017, DFA's marketing service, DMS, profitably marketed the milk of independent dairy farmers and cooperatives on a fee basis.  DFA had coerced large portions of these independent dairy farmers and cooperatives to use DMS in the first instance through agreeing to "outsourcing agreements" with various Northeast processers such as Dean Foods, Suiza, Farmland, HP Hood, and Kraft, in the pre-Class Period.[45]

135.    Pursuant to these outsourcing agreements, the raw milk processor no longer contracted with independent dairy farms and cooperatives to procure raw milk directly.  Instead, the processor paid DMS to procure the milk on its behalf and perform milk marketing services

---

[44]    *Sitts*, 417 F. Supp. 3d at 458.

[45]    *Id.* at 454-55.  DMS acted as marketing agent for various cooperatives beyond its three member cooperatives, DFA, Dairylea, and St. Albans, in the period immediately before the commencement of the class period, including: 1) National Farmers Organization, 2) Schoharie County Cooperative Dairies, 3) Konhokton Milk Producers Cooperative, 4) Massachusetts Cooperative Milk Producers Federation Inc., 5) Tioga Valley Cooperative Bulk Milk Producers Association, 6) Liberty Valley Cooperative Milk Producers Association, 7) South New Berlin, 8) Western Tier Milk Producers Cooperative, 9) Port Allegany Cooperative Milk Producers Association, 10) Farmers Friendly Cooperative Inc., 11) North Penn Bulk Milk Producers Cooperative, Inc., 12) Mount Joy Farmers Co-Operative, 13) Cortland Bulk Milk Producers, 14) Oneida-Madison Milk Producers Cooperative, 15) Jefferson Bulk Milk Cooperative, 16) United Dairy Cooperative Services, Inc., 17) Lowville Producers Dairy Cooperative Inc, and 18) Land O'Lakes.

(such as inspecting, testing, hauling, pricing, and invoicing) necessary to get the dairy farmer's milk from the farm to the plant.

136.    These outsourcing agreements made no economic sense to the processers, who lost the ability to play would-be competing raw milk suppliers against each other. Indeed, the agreements made sense only in the context of the anticompetitive agreements between DFA and these raw milk processors, addressed in the *Sitts* case, to suppress the price of raw milk. There, a Dean Foods' executive, Alan Bernon, "acknowledged that he was not aware of any benefits Dean received as a result of its outsourcing agreement because, without the agreement, '[y]ou had an opportunity to go into the marketplace and get the best deal you could'" for raw milk.[46]

137.    After securing these outsourcing agreements, DFA provided the independent dairy farms that previously supplied these processors a choice of: (a) joining DFA or DMS to be able to continue to supply the raw milk processor; or (b) risk not having a home for their milk. Unsurprisingly, given the substantial barriers the dairy farmers faced in finding another market for their milk, whether by buying their own milk plant, bottling their own milk, or pooling resources to send their milk long distances to non-DFA processing plants, most chose to join DFA or DMS, increasing DFA's market power. *See* Section IV(D) above (describing barriers to entry).

138.    However, given DFA's commitment to ensuring a high supply/low price raw milk paradigm in the Northeast Dairy Market, this arrangement of marketing independents' raw milk through DMS, despite having been a profitable source of revenue for DFA for over a decade,[47]

---

[46]    *Id.* at 452 (brackets in original).

[47]    In addition to the fees DFA/DMS obtained from the independent cooperatives and dairy farms, DFA also received fees from the processors with whom it had an outsourcing agreement. Moreover, by forcing independent cooperatives and dairy farmers to market through it, it was able to suppress competition for raw Grade A milk, which lowered milk prices, thereby benefiting DFA's processing arms. *See id.* at 452 (describing evidence that DFA used the outsourcing agreements to suppress raw Grade A milk prices in the Northeast).

was only a steppingstone towards DFA's ultimate objective: converting these independent farmers to DFA members so that it could further suppress the price of raw Grade A milk in the Northeast.

139.    As discussed above, raw milk that is sold pursuant to the FMMO regulatory regime is known in the dairy industry as "pooled" milk and is subject, in part, to the FMMO pricing formulas. Raw milk sold outside the FMMO regime is known as "depooled" milk, and the price for that milk is set by the market.

140.    Because of the FMMO No. 1 regulatory rules, which are designed to prevent cyclical pooling and depooling, all or nearly all of the raw milk brought to market in FMMO No. 1 is pooled.

141.    In times of oversupply, excess milk must be "dumped,"[48] and co-ops that pool their milk (including DFA, and by extension, DMS) must bear the cost of the dumped milk.

142.    Co-ops, including DFA, pass that cost on to their members in the form of deductions on members' milk checks.

143.    However, because independent dairy farmers are not members of the co-op, there were limitations on DFA/DMS's ability to pay the independents less than the FMMO No. 1 blend price, leading to a scenario where independents marketing their milk through DMS were making more money than DFA members as a result of the raw Grade A milk oversupply market conditions that DFA/DMS had created in the Northeast to benefit DFA's processing arms.

144.    If the Northeast Dairy Market were properly functioning, this would present a transient problem – periods of oversupply could not endure, and the financial benefits that

---

[48]    "Dumped" milk can mean either milk physically dumped out into the soil because there is no buyer, or milk sold in bulk at a deep discount (usually to a butter or cheese processor). For present purposes, that distinction does not matter – in either case, the seller must absorb a significant financial loss on the dumped milk.

independents would accrue during those short oversupply periods would be offset by the benefits that DFA members receive at all other times.

145. However, as outlined above, DFA has structured its organization and used its market power to take overt actions to create a durable high supply/low-cost paradigm in the Northeast Dairy Market. In other words, DFA knew that conditions of oversupply and low raw Grade A raw milk prices were not transient, but rather the new normal, put into being to benefit DFA's processing arm and its processing partners, such as HP Hood and Dean Foods.

146. Acting in accordance with that goal, on January 12, 2017, DFA petitioned the administrator of FMMO No. 1 to relax the pooling rules in FMMO No. 1.

147. The practical effect of DFA's request would be to allow DFA to partially or fully depool independent farmers' milk at DFA's sole discretion, and without the traditional penalties that prevent cyclical pooling and depooling.

148. This would allow DFA to choose to pool or depool independent farmers' milk marketed through DMS based on which decision would be most financially advantageous to DFA, allowing it to encourage an oversupply of raw milk while avoiding pooling regulations designed to ensure dairy purchasers fairly compensate those who produced the milk.

149. At the same time, DFA wrote to 794 independent farmers using DMS on January 19, 2017, informing them that DFA intended to use the relaxed pooling rules to "de-pool portions, or all, of [their] milk supplies[,]" and advised that independent farmers unhappy with DFA's plans could "explore other marketing options" or "join a cooperative within the [DFA] DMS milk marketing system."[49] Put another way, DFA told the independents that it intended to use the power it was requesting from the USDA to pay the independents less unless they joined DFA.

---

[49]     *Id.* at 457.

150.    But in the face of industry opposition DFA dropped the proposed changes to pooling regulations via letter to the USDA dated February 17, 2017.

151.    However, DFA was undeterred from their ultimate goal of coercing these competing dairy farms to become full DFA members.  Converting the independents to DFA members would allow DFA (and its raw milk processing partners) to continue to benefit from the high volume/low price milk environment it had created, while allowing its marketing division to earn more sales commissions.  Importantly, it would give DFA access to additional capital to borrow against and fund the further expansion of its commercial arm.  That capital would come in the form of additional retained earnings from the new members.

152.    Consequently, in March 2017, DFA sent further letters informing the Northeast independent dairy farmers that had previously marketed their raw milk through DMS that it would no longer market their milk after October 31, 2017, unless those farmers joined DFA.[50]  Several of these letters euphemistically told these independents that "[i]f you can't find another market, DFA will offer you membership and will continue to market your milk."  However, there was no other market for them to access.  In 2018, DMS CEO Brad Keating admitted as such, testifying that he was not aware of any non-DFA cooperatives or processors in the Northeast that were accepting new members or additional milk in 2017.[51]  Likewise, DFA board member Patricia Bikowsky testified that "anybody who was looking to find an independent market to take them [in 2017] probably couldn't find one."[52]

---

[50]    *Id.*

[51]    *Id.* at 457 n.10.

[52]    *Id.*

153.    Another DFA board member who testified in *Sitts* confirmed that the intent of these letters was to "advis[e] the independent farmers that at some point [DMS] was no longer going to pick up their milk unless they joined DFA."[53]

154.    One Northeast Pennsylvania dairy farmer commenting in April 2017 on the letters independent cooperatives received notifying them of cancellation of their DMS marketing contract noted: "[a]ll independents have been terminated starting in [N]ovember.  All contracts up for review with DMS will be aggressively reworked and/or terminated. Squash the competition and absorb the pieces.  DFA will increase paying membership by 15% in the next 4 years unless antitrust suits pop up.  Once they control the market they can do as they please."  Responding to this comment, another New York farmer noted that the "DFA speaker at the Oneida-Madison Coop[54] banquet said it's likely to happen within two years, most likely less," and that while he was not at the banquet, that he had "talk[ed] to Rich[ard Smith, DFA CEO] yesterday to verify."

155.    DFA's plan worked, and 630 of the 794 independent farmers that were terminated by DMS joined DFA.[55]  A number of the remaining farmers went out of business.[56]

156.    Parallel to this, from November 2016 and throughout 2017, DMS cancelled all its marketing agreements with the approximately 16 cooperatives that used its services.  Many of these cooperatives, such as the Schenevus-Elk Creek Milk Producers Coop, were forced to dissolve.  But many dairy farms joined DFA.[57]  Adding these cooperatives' membership to DFA's

---

53      *Id.* at 457.

54      Oneida-Madison Milk Producers was one of the independent cooperatives who marketed its milk through DMS but whose contract was cancelled.

55      *Sitts*, 417 F. Supp. 3d at 457.

56      This is reflected in FMMO No. 1 report that the marketing area "ended [2017] with 158 fewer producers than at the end of 2016."

57      *Sitts*, 417 F. Supp. 3d at 457-58.

headcount, DFA vacuumed up approximately 1,000 new members through this scheme, an approximately 40% increase on its prior Northeast headcount.[58]

157. Though it was not explicit in the announcement, DFA had decided to shutter DMS in the anticipation that all the independent farmers it had previously served would be forced to join DFA. DFA merged DMS into DFA in December 2018.

158. And those that did join DFA, like John Lamport, a dairy farmer in the Catskills, New York, saw their incomes drop immediately. Mr. Lamport, whose family farm was forced to sell through DMS in 2001 after Dean Foods reached an outsourcing agreement with DFA/DMS, was a recipient of DFA's 2017 letters telling independents to join DFA by October 2017 or go without a market for their milk. Mr. Lamport felt he had no choice, and agreed to join DFA. However, the significant reduction in his monthly milk check, driven by "DFA['s] deduct[ion of] marketing fees and other surcharges,"[59] drove Mr. Lamport out of the dairy industry.

### C. 2019 – DFA Coerces St. Albans' Creamery Dairy Members to Join DFA

159. On August 1, 2019, in an effort to stave off bankruptcy caused by the market conditions created by DFA, St. Albans Cooperative Creamery, a cooperative based in St. Albans, Vermont, voted to merge with DFA.

160. This "merger" added all 340 of St. Albans' members, all based in Vermont, New York, and New Hampshire, to the approximately 3,100 DFA farms already in DFA's Northeast Area, in addition to an additional processing plant and milk hauling operations.

---

[58]     Hearing Tr. at 113:21-114:15, *Sitts* (Apr. 9, 2019), ECF No. 120.

[59]     David Yaffe-Bellany, *America's Dairy Farmers are Hurting. A Giant Merger Could Make Things Worse*, NEW YORK TIMES (Dec. 11, 2019), https://www.nytimes.com/2019/12/11/business/dean-foods-dairy-farmers-antitrust.html.

161.    St. Albans members were given a Hobson's choice: join DFA or see St. Albans lose their access to the market, go bankrupt, and be acquired by DFA for cents on the dollar.  As local observers noted at the time, "behind that [vote to merge with DFA] was the feeling that farmers didn't have a choice."

162.    St. Albans members, such as Kevin Howrigan of Sheldon, Vermont, acknowledged that a vote against joining DFA was leaving St. Albans to the fate of other co-ops that did not yield to DFA's pressure, a future where members would likely "go bankrupt with nowhere to go with their milk."

163.    Cedric White Jr., of East Fairfield, Vermont, saw joining DFA as "certainly better than going bankrupt," and Rich Berard of Fairfield, Vermont, noted that if he didn't join DFA, DFA "could have bought us out of bankruptcy two, three years down the road."

164.    St. Albans' members ultimately yielded under DFA's long-term pressure on the Northeast Dairy Market, with farmers like Steve Dodd of Sheldon, Vermont, acknowledging that the inevitability of having to join DFA or go under had "been coming for the past five, six years."

165.    Many members, including James Normandin of Ellenberg, New York, expressed reluctance to join DFA, observing that they "don't really see much of a choice" and were "stuck having to be bailed out pretty much by DFA" because they didn't "believe the co-op could survive without it."

166.    Other members, like Harold Sunderland of Bridport, Vermont, felt that "we've got to vote in yes, 'cause we're kind of in a bind," and that members had little choice but to vote yes. Bill Rowell of Sheldon, Vermont, explained the problem simply, "we don't have any other place to market our milk."

167.    Implicitly acknowledging the effects of DFA's years-long campaign to gain monopsony power over the Northeast market for raw Grade A Milk, even DFA's then-COO, Brad Keating, acknowledged that St. Albans' co-op members had no other choice but to join DFA because the "risk [for St. Albans' members] of not having a place to go with the milk is too high now."

168.    In the end, St. Albans' members such as Howard Bennett of St. Johnsbury, Vermont, knew what the deal boiled down to: "Basically it looks to me like you're getting a place to market your milk, and you're giving [DFA] a company."

169.    As part of this merger, DFA also took ownership of St. Albans Cooperative Creamery Plant (one of Vermont's few raw milk processing plants, and a producer of cream and ice cream amongst other products), the St. Albans Cooperative Store, and McDermotts, a hauling company previously owned by St. Albans.

170.    The acquisition of McDermotts included approximately 80 refrigerated dairy trucks.  After the acquisition, McDermotts was rebranded as DFA Northeast Logistics, Inc.

171.    It has been reported that several of the 80 refrigerated trucks that DFA acquired in the McDermotts acquisition were immediately idled and have remained idled to date, indicating that DFA acquired excess hauling capacity in the transaction, then purposely idled that capacity to limit would-be competitors' ability to get their milk to market without having to go through DFA.

**D.    2020 – DFA Acquires Substantially All of Dean Foods' Assets Thereby Avoiding Any Potential Competition to Supply Deans' Critical Northeast Fluid Milk Plants**

172.    On November 12, 2019, Dean Foods initiated bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No. 19-36313.

173. As noted above, leading up to its bankruptcy, Dean was the largest fluid milk processor in the U.S., and DFA was Dean's largest supplier of raw Grade A milk. Likewise, Dean was DFA's largest customer.[60]

174. When it filed its bankruptcy petition, Dean Foods simultaneously issued a press release stating that it was in advanced negotiations with DFA – and only DFA – to sell substantially all of its assets to DFA in a bankruptcy process designed to avoid antitrust scrutiny.

175. The onset of the coronavirus pandemic and the resultant evaporation of demand for fluid milk from shuttered schools and restaurants put additional pressure on Dean's financial position. Dean therefore requested an accelerated bidding process.

176. In the bankruptcy bidding process, Dean received bids on several of its plants from potential regional buyers (and for some plants, more than one regional buyer) as well as a bid from DFA. However, DFA's bid was an "all or nothing" bid. That is, DFA insisted on buying all 44 of Dean's plants subject to its bid, or none at all. By structuring its offer this way, DFA exerted considerable pressure on Dean (and subsequently the bankruptcy court) to accept DFA's bid, and effectively foreclosed both Dean from maximizing the value it might have received for the sale of each plant and DFA's competitors from expanding their processing presence.

177. On March 31, 2020, on a compressed timetable, Dean announced DFA as the winning bidder for the assets DFA had bid on with the take it or leave it bid.

178. The bankruptcy court approved DFA to purchase 44 of Dean's 57 fluid milk processing plants, along with various other assets (including the real estate, inventory, and equipment), for a total value of $433 million. The purchase price consisted of $325 million in cash and $108 million in debt forgiveness (owed by Dean to DFA).

---

[60]     *Supra*, note 10, ¶¶13-14.

179. Seven of the 44 former Dean fluid milk processing facilities that DFA purchased in the bankruptcy sale are located in the Northeast. These included: three in the portion of Pennsylvania that lies within the Northeast Dairy Market, two in Massachusetts, and one plant each in New Jersey and New York.

180. DFA's acquisition of the seven Dean fluid milk processing plants added to those DFA already owned in the Northeast Dairy Market, including: four plants in the portion of Pennsylvania in the Northeast Dairy Market, and one each in Connecticut, Maine, Maryland, New Jersey, and New York.

181. On May 1, 2020, the U.S. Department of Justice ("DOJ") sued DFA to block DFA's planned acquisition of certain of Dean's assets, including Dean Foods' Franklin, Massachusetts, fluid milk plant ("Franklin Plant").

182. At the time of Dean's bankruptcy, the Franklin Plant had the capacity to process about 90 million pounds of raw milk per month, and DFA was supplying over 95% of the plant's raw milk as a result of its soon to be expired Side Note agreement.[61]

183. Prior to Dean's bankruptcy, the Franklin Plant was sourcing milk from seven states in the Northeast, weighted heavily towards states in New England.[62]

184. According to DFA's Executive Vice President Gregory Wickham, the Franklin Plant "is critically important to all dairy farmers in New England."[63]

---

[61] *Supra*, note 10, ¶17.

[62] *Id.*

[63] *Id.*

53

185.    In its challenge to the Dean acquisition, the DOJ stated that in New England (a subset of states in the Northeast Dairy Market at issue here),[64] DFA's acquisition of the Franklin Plant would be "presumptively unlawful."[65]  The DOJ had concluded that:

> For fluid milk customers in New England, the combined market share of Dean's processing plant in Franklin, Massachusetts, and DFA's processing plants in New Britain, Connecticut, and Portland, Maine is estimated to be approximately 51%. The result is a highly concentrated market . . . . There is a history of anticompetitive coordination, including price-fixing, bid-rigging, and customer allocation in fluid milk markets in the United States . . . ."[66]

186.    In the complaint, the DOJ added that if DFA acquired the Franklin Plant, that "the acquisition would eliminate one competitor, leaving just two remaining competitive options for fluid milk customers, with DFA controlling a significant majority of fluid milk sales."[67]

187.    DFA ultimately agreed to a Proposed Final Judgment with the DOJ to resolve the DOJ's merger challenge.  As part of this agreement, DFA agreed to divest the Franklin Plant it had just acquired from Dean.  DFA was given 30 days, with the possibility of a further 60-day extension, to complete the divestiture.

188.    Due in large part to the high barriers to entry that DFA had itself caused by its actions over the previous decade-plus, only one buyer initially came forward to bid on the Franklin Plant.  However, the trustee appointed by the bankruptcy court to oversee the divestiture determined that the bidder, a joint venture between a private equity firm and an ice cream

---

[64]    The DOJ defined the relevant geographic market at issue in its challenge to the Franklin Plant acquisition as "New England – including the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont."  *Supra*, note 27, DOJ DFA Dean Foods Compl., ¶18.

[65]    *Id.,* ¶¶22, 28.

[66]    *Id.*

[67]    *Id.*, ¶19.

54

manufacturer, lacked "the operational background or capability to operate a large-scale fluid milk processing plant."[68]

189.    The divestiture trustee then engaged a consortium of four firms with the experience and capabilities to purchase and turn around the Franklin Plant, but could not close the transaction within the compressed time schedule afforded by the Proposed Final Judgment.[69]

190.    DFA moved the bankruptcy court to allow them to keep the Franklin Plant, under a clause in the consent decree that allowed the Franklin Plant to remain in DFA's hands if a suitable buyer could not be found.  Perversely, DFA claimed that clause was included in part because "the distressed condition of the fluid milk industry" – which DFA itself helped bring about – meant that finding another buyer was unlikely.[70]

191.    The DOJ, despite finding that DFA's acquisition of the Franklin Plant would result in DFA unlawfully acquiring market power in the fluid milk processing market, consented to DFA retaining the Franklin Plant.  The DOJ cited concerns about disrupting the dairy supply chain during the coronavirus pandemic – and not a reversal of its earlier findings of anticompetitive impact – as the reason for relenting.[71]

192.    The bankruptcy court ultimately approved DFA's retention of the Franklin Plant.

---

[68]    Decl. of Jerry Sturgill, ¶9, *United States v. Dairy Farmers of Am., Inc.*, 1:20-cv-02658 (D. Vt. Dec. 3, 2020), ECF No. 55-1.

[69]    *Id.*, ¶10.

[70]    Dairy Farmers of America, Inc.'s Unopposed Motion to Retain the Franklin Plant, at 8, *United States v. Dairy Farmers of Am., Inc.*, 1:20-cv-02658 (D. Vt. Dec. 3, 2020), ECF No. 54.

[71]    United States' Response to the Motion of Defendant, Dairy Farmers of America, Inc., to Retain the Franklin Plant, at 5-6, *United States v. Dairy Farmers of Am., Inc.* 1:20-cv-02658 (D. Vt. Dec. 3, 2020), ECF No. 55 ("[I]t is better for consumers that DFA operate the Franklin Plant rather than the Franklin Plant closing in the absence of such a buyer – particularly during a pandemic when the food supply is particularly important.").

193. When DFA and Dean closed on the asset sale, DFA immediately became both the largest raw milk producer and the largest milk processor in the United States. DFA now controls supply rights to the legacy Dean plants in perpetuity. Upon information and belief, DFA is the exclusive or near-exclusive provider of raw milk for all or nearly all of the 42 fluid milk plants that DFA acquired from Dean Foods, including the seven Northeast plants.[72] Indeed, DFA went from selling over 50% of its members' milk to third-party processors in 2019 to selling over 66% of its members' milk to itself in 2021.[73]

194. Consequently, the competition to supply Dean's fluid milk plants promised by the 2021 expiration of Dean and DFA's side note never eventuated, a fact noted by industry participants commenting on the proposed acquisition.

195. Charles Untz, a dairy farmer and former DFA board member stated: "As a producer, I'm concerned about DFA making this large a purchase. . . . It puts a lot of the control of the fluid market in the hands of one co-op. That sends a little fear as far as the milk price goes, because they can literally dictate what they pay for milk."

196. Commentators also highlighted that DFA's acquisition of most of Dean's assets "would exacerbate DFA's conflict of interest between its processing operations and its members, since processing operations reap higher profits the less they pay farmers for milk. . . . [A] fair share of processing profits 'never seems to make it to the farmers.'"[74]

---

[72] Plaintiff understands that DFA has subsequently shuttered two of the 44 plants purchased from Dean.

[73] Corey Geiger, *DFA transforms itself from supplier to processor*, HOARD'S DAIRYMAN (Mar. 30, 2022 08:00 AM), https://hoards.com/article-31747-dfa-transforms-itself-from-supplier-to-processor.html.

[74] *The Monopolization of Milk*, THE BULLVINE (Nov. 25, 2019), https://www.thebullvine.com/news/the-monopolization-of-milk/.

**E.    2021 – DFA Signs Exclusive Supply Deal with Wakefern to Force More Independents to Join DFA**

197.    In December 2021, DFA made a deal with Wakefern Food Corp., a co-operative owned by hundreds of retailers, including Shop-Rite, to be the exclusive supplier of its Readington Farms branded fluid milk bottling plant in White House, New Jersey.

198.    Prior to signing the exclusive supply contract with DFA, Wakefern Food Corp. ("Wakefern") had relied on 150 independent dairy farmers and additional cooperatives to supply the raw milk for the Readington Farms' White House plant.

199.    This move forced those 150 independent dairy farmers and additional cooperatives to either find a new purchaser for their milk, join DFA, or go out of business.

200.    Notably, prior to signing the exclusive supply contract with DFA, Wakefern had also been in negotiations with the state of Pennsylvania to build a new fluid milk processing plant.

201.    Wakefern's new plant was to cost $250 million-$300 million to build,[75] and was part of the company's then-planned milk processing business expansion.[76]

202.    This planned plant would have competed directly with DFA's seven fluid milk plants within Wakefern's territory.

203.    Instead, after signing on with DFA, Wakefern scrapped its plans to build the new plant, announced that it is no longer planning to expand its milk processing business, and

---

[75]    Rudy Miller, *Mooooving on: $250M dairy plant once slated for Palmer Twp. is headed to Lehigh County*, LEHIGHVALLEYLIVE.COM (Apr. 23, 2021 7:01 a.m.), https://www.lehighvalleylive.com/news/2021/08/mooooving-on-250m-dairy-plant-once-slated-for-palmer-twp-is-headed-to-lehigh-county.html.

[76]    Rudy Miller, *Holy cow! Dairy plant could pump $250 million into Easton area, project backer says*, LEHIGHVALLEYLIVE.COM (Apr. 5, 2019 6:30 a.m.), https://www.lehighvalleylive.com/news/2019/04/holy-cow-dairy-plant-could-pump-250-million-into-easton-area-project-backer-says.html.

confirmed that the existing Readington Farms fluid milk plant in New Jersey would close by Q1 2022.

204.     Moreover, it wrote to the independent dairy farmers who previously supplied Readington Farms in December 2021 and told them they needed to find a new market for their milk following its agreement to be exclusively supplied by DFA.  Those letters included contact information for the local DFA representative, and a suggestion that "[a]s part of the transition, DFA is working toward a path to membership for each of you, if you choose, to market your milk with them."

205.     As President of Pro-Ag, an organization representing PA and NY dairy farmers based in Meshoppen, PA, Arden Tewksbury put it:

> It is obvious from the letter issued to the farmers that Readington and ShopRite have created a sweetheart deal with Dairy Farmers of America to take over their farmers.  However, it is very evident that no one has taken the pulse of their dairy farmers.

206.     By securing the exclusive supply contract for the Readington bottling plant, DFA was able to exert substantial pressure on 150 independent farmers and the independent cooperatives that previously supplied Readington to join DFA, and kill plans for a competing processing plant, all at once.

### F.     2022 – DFA Buys GTI Transportation to Force Even More Independents to Join DFA

207.     In 2022, DFA purchased Greene Trucking, Inc. ("GTI"), an Eastern New York dairy hauler based in Amsterdam, New York.

208.     Prior to DFA's acquisition, GTI reportedly served at least seven non-DFA co-operatives and several independent dairy farms located between Syracuse, New York, and western Vermont.

209. As part of the transaction, DFA acquired approximately 45 refrigerated trucks operated by GTI.

210. Given the excess hauling capacity DFA acquired and idled in the McDermotts purchase less than 18 months prior (*see* ¶¶169-171 above), acquiring GTI's 45 refrigerated trucks did not serve a rational business purpose.

211. Instead, the motivation was to create another chokepoint in the Northeast Dairy Market that DFA could use to coerce independents to join DFA. Unsurprisingly, immediately upon purchasing GTI, DFA informed GTI's former non-DFA customers that those independent dairy farms and co-operatives (including Agri-Mark, the Producers Cooperative, the Moonvile Milk Co-Op, the Producers Cooperative, the Boonville Milk Co-Op, the Mohawk Co-Op, and the National Farmers Organization) had until July 1, 2022, to either join DFA or find another hauler to get their milk to the processors that bought it. Given the dearth of independent haulers with capacity, many are expected to bow to this coercion and reluctantly join DFA.

## VII. HARM TO COMPETITION AND ANTITRUST INJURY

212. DFA's conduct has harmed competition in the Northeast market for raw Grade A milk and artificially suppressed the price received by Northeast milk farmers for their raw Grade A milk.

213. While there is no publicly available record of the prices paid by DFA to its farmer members or the prices it received from Northeast processors (including those it owned or controlled), the available information indicates that raw Grade A milk prices have been artificially suppressed below the competitive level.

214. Indeed, DFA's sales prices are only publicly available nationally. Figure 2 illustrates the disconnect between the price DFA receives and what DFA actually pays its members.

59

**Figure 2.  Prices Received by DFA Nationally vs. Prices Paid to Members**



215.    From 2015 through 2019, the difference between DFA's average sales price and the average price DFA paid to its members remained relatively consistent. Then in 2020, the gap between the two prices significantly expanded, with DFA netting over $10.00 per cwt more than what DFA paid to its member-farmers.

216.    USDA price reporting in the Northeast FMMO No. 1, which noted above substantially overlaps with the Northeast geographic market at issue here, also illustrates the price impact DFA's conduct has had.

217.    Using this publicly available information, one can compare, for example, the monthly mailbox milk price (an estimate of dairy farms' milk check) with the component value of milk using average pool component tests in FMMO No. 1.  Table 2 below provides this information.

**Table 2.  Comparison of Milk Check Estimates (Mailbox Milk Price) and the USDA's estimates of the Value of Raw Milk in FMMO No. 1: New York (NY), New England (NE) and Eastern Pennsylvania (Eastern PA)**

| Date Range | NY Mailbox Milk Price | NE Mailbox Milk Price | Eastern PA Mailbox Milk Price | FMMO 1 Statistical Uniform Price at Component Tests | NY Mailbox vs. Stat. Unif. at Avg. Tests | NE Mailbox vs. Stat. Unif. at Avg. Tests | Eastern PA Mailbox vs. Stat. Unif. at Avg. Tests |
|---|---|---|---|---|---|---|---|
| 2010-2015 | 19.53 | 20.66 | 19.86 | 20.38 | -0.86 | 0.28 | -0.53 |
| 2016-2019 | 16.81 | 17.99 | 16.73 | 17.98 | -1.17 | 0.01 | -1.25 |
| 2020-2022 | 18.19 | 18.99 | 18.09 | 20.49 | -2.30 | -1.50 | -2.40 |

218.    The data in Table 2 demonstrates that during the Class Period, mailbox milk prices (the USDA's estimate of dairy farmers' milk check) were substantially lower relative to the FMMO No. 1 statistical uniform price at pool average component tests.  That is, Northeast dairy farmers dairy milk checks were substantially lower than the USDA's estimate of the value of the raw milk they provided.  And that gap increased as the Class Period progressed, notwithstanding that Northeast raw milk prices were already artificially suppressed in the pre-Class Period as a result of DFA's prior anticompetitive misconduct.  In this environment, it is not surprising that DFA's EBITDA (earnings before interest, taxes, depreciation, and amortization) increased every year from 2015 to 2021 as its processing arms reaped the benefit of low raw milk prices in the Northeast.  However, the percentage of EBITDA that DFA distributed to its members has decreased to just 8.9% in 2020, before rising slightly in 2021:

**Table 3.  Comparison of DFA EBITDA to DFA Member Distributions[77]**

| Year | Adjusted EBITDA | Cash Distributed to Members | Percentage of EBITDA Distributed to Members |
|---|---|---|---|
| 2015 | $175 million | $35 million | 20% |
| 2016 | $238 million | $42 million | 17.6% |
| 2017 | $240 million | $60 million | 25% |
| 2018 | $241 million | $56 million | 23.2% |
| 2019 | $318 million | $60 million | 18.9% |
| 2020 | $515 million | $46 million | 8.9% |
| 2021 | $574 million | $76 million | 13.2% |

219.    This pattern is also consistent with DFA using it member's retained earnings to fund further acquisitions, which as shown above, were to the detriment of its members.

---

[77]    This data is excerpted from DFA's Annual Reports; this is the amount of cash DFA says it has distributed to its members in each of the last seven years.  The actual amounts may be lower.

220.    DFA's actions also harmed competition in the Northeast market for raw Grade A milk by foreclosing competing dairy farms and cooperatives access to raw milk processors. This limited the number of potential buyers available to dairy farmers who might seek to avoid the effect of artificially low prices by independently selling their milk to processors independent of DFA ownership or control. These actions included DFA's acquisition of the Dean plants to extend the effect of the Side Note, DFA's acquisition of St. Albans' processing plant, DFA's deal with Wakefern which diminished Northeast processing capacity, DFA's exclusive supply agreements, and its closure of DMS to push independent dairy farms into DFA. As a result of this conduct, independent dairy farmers (such as those who previously supplied Wakefern or marketed their milk through DMS) and those who are members of competing cooperatives were foreclosed from marketing their milk to non-DFA controlled processers, placing them at a significant disadvantage to DFA. Competing cooperatives were foreclosed from recruiting other dairy farmers to join their co-operatives because they could not offer assurances that they could find a market for their milk, let alone a profitable one. Also, independent dairy farmers were foreclosed from establishing new cooperatives as an alternative to DFA because DFA's actions raised the barriers to entry faced by a prospective new cooperative intent on finding a market for their members' milk outside of DFA. *See* Section IV(D) above.

221.    Similarly, but for DFA's stranglehold on the Northeast hauling operations and processing outlets, these independent dairy farmers would have benefited from the potential to better market their milk through more efficient cooperatives.

222.    The impact of DFA's monopsony, and of the anticompetitive, exclusionary, and predatory actions taken in furtherance of it, on Northeast dairy farmers can be seen in the USDA's estimates of dairy profitability over the Class Period, which shows significant losses. Set out

below are the estimates pertaining to Vermont and New York dairy farms, but estimates for

producers located in other Northeast states show similar re-occurring losses.

**Table 4.   USDA ERS estimate of milk production costs and returns (dollars per hundredweight): Vermont[78]**

| | Vermont | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| **Revenue** | | | | | | |
| Milk sold | 20.05 | 21.60 | 19.80 | 22.28 | 21.19 | 22.48 |
| Total value of production (incl. misc. income) | 21.96 | 23.36 | 21.48 | 23.97 | 22.89 | 24.40 |
| **Costs** | | | | | | |
| Operating costs | 15.44 | 15.60 | 17.00 | 17.88 | 16.87 | 21.03 |
| Allocated overhead | 13.48 | 13.91 | 14.25 | 14.60 | 14.70 | 15.78 |
| Total costs | 28.92 | 29.51 | 31.25 | 32.48 | 31.57 | 36.81 |
| **Profit Loss** | | | | | | |
| Value of production less total costs listed | -6.96 | -6.15 | -9.77 | -8.51 | -8.68 | -12.41 |

**Table 5.   USDA ERS estimate of milk production costs and returns (dollars per hundredweight): New York[79]**

| | New York | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| **Revenue** | | | | | | |
| Milk sold | 17.74 | 18.98 | 17.43 | 19.71 | 18.50 | 19.69 |
| Total value of production (incl. misc. income) | 19.30 | 20.43 | 18.80 | 21.08 | 19.89 | 21.25 |
| **Costs** | | | | | | |
| Operating costs | 13.89 | 13.97 | 15.20 | 15.97 | 15.10 | 18.80 |
| Allocated overhead | 11.49 | 11.89 | 12.47 | 12.93 | 13.13 | 14.10 |
| Total costs | 25.38 | 25.86 | 27.67 | 28.90 | 28.23 | 32.90 |
| **Profit / Loss** | | | | | | |
| Value of production less total costs listed | -6.08 | -5.43 | -8.87 | -7.82 | -8.34 | -11.65 |

223.   Furthermore, while Grade A raw milk supply is inelastic in the short term, the

sustained price suppression caused by DFA's exercise of monopsonist power has resulted, or will

eventually result in, quantity reductions in the supply and processing of raw milk.  This reduction

---

[78]   USDA, Milk Cost of Production Estimates-2016 Base, https://www.ers.usda.gov/data-products/milk-cost-of-production-estimates/.

[79]   *Id.*

in supply can be witnessed in the number of dairy farms permanently exiting the market (*see* Section IV(C) above).

224.    DFA's actions also harmed independent processors, who would have had access to multiple, competitive suppliers of raw milk, which would have allowed those plants to seek raw milk through efficient and mutually beneficial milk supply agreements.

225.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having been paid lower prices for raw Grade A milk than they would have been paid in the absence of DFA's illegal monopsony, and as a result, have suffered damages.

226.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CLASS ACTION ALLEGATIONS

227.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All dairy farmers, whether individuals or entities, who produced raw Grade A milk within the Northeastern United States, as defined by DFA's Northeast Area region, composed of all of Vermont, New Hampshire, Maine, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Maryland, Delaware, and most of Pennsylvania (except the western portion), and sold raw Grade A milk within the Northeastern United States during any time from May 10, 2016 to the present.

228.    Excluded from the meaning of raw Grade A milk for the Class is raw milk produced in accordance with recognized organic certification, such as the USDA's National Organic Program. Excluded from the Class are the plaintiffs from the *Sitts* litigation, as well as Defendants and their officers and directors. Also excluded is the Judge presiding over this action, his or her

law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

229.    **Class Period**: The Class Period is presently defined as May 10, 2016, through the present. Plaintiff reserves all rights to amend this Complaint as appropriate.

230.    **Class Identity**: The Class is readily identifiable and is one for which records should exist.

231.    **Numerosity**: Plaintiff does not know the precise number of members of the proposed Class because such information presently is in the control of DFA and other market participants, due to the privatized nature of raw Grade A milk sales from producer-farmers. Plaintiff believes that due to the nature of the trade and commerce involved, and USDA reports on the number of licensed dairies operating in the Northeast, that there are at least 7,000 Class members geographically dispersed across several states throughout the Northeastern United States, such that joinder of all class members is impracticable.

232.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff is a dairy farmer who produced and sold raw Grade A milk in the Northeast, and received artificially suppressed prices for their milk as a result of DFA's conduct, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

233.    **Common Questions Predominate**: There are questions of law and fact common to the Class, including, but not limited to:

        A.    The applicable product market(s);

        B.    The applicable geographic markets(s);

66

C.     Whether the alleged monopsony violated the federal antitrust laws, including specifically Section 2 of the Sherman Act, 15 U.S.C. §2;

D.     Whether the conduct of DFA, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other Class members;

E.     The effect(s) of DFA's alleged monopsony on the prices paid to Plaintiff and other Class members for their raw Grade A milk during the Class Period;

F.     Whether Plaintiff and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

G.     In addition to injunctive relief, the appropriate Class-wide measure of damages, including whether Plaintiff and other Class members are entitled to: (1) monetary relief, including treble damages, as well as the appropriate class-wide measure of damages; (2) interest from the date they should have received all monies rightfully owed; and (3) attorneys' fees and costs, and (4) any other relief the Court deems just and reasonable.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

234.   **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who produced and sold Grade A milk in the Northeast, and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

235.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Furthermore, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

236.    The Class is readily definable and is one for which records likely exist in the files of DFA and other market participants.

237.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for DFA.

238.    DFA has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    FRAUDULENT CONCEALMENT

239.    As discussed above, DFA was previously alleged to have violated the federal antitrust laws, including, *inter alia*, for monopoly and monopsony in the Northeast. *See Allen v. Dairy Farmers of Am., Inc., et al.*, No. 09-cv-00230-cr (D. Vt.); *Sitts v. Dairy Farmers of Am., Inc., et al.*, No. 16-cv-00287-cr (D. Vt.). DFA settled the *Allen* matter, releasing claims through May 9, 2016, the day before the Class Period commences in this lawsuit. DFA settled the *Sitts*

matter in September 2020, on undisclosed terms. In the *Allen* settlement, DFA continued to deny any wrongdoing.

240.    Moreover, in the *Allen* settlement, DFA purportedly agreed to implement structural reforms that took the form of court-approved injunctive relief. *See Allen*, No. 09-cv-00230-cr, ECF No. 712-2. These include, *inter alia*: (a) a restriction precluding DFA from entering into any new full-supply agreements in FMMO No. 1; (b) requiring that when DFA terminated or chose not to renew a Class member's milk marketing agreement, that certain conditions would apply, including the provision of written notice and a six-month grace period; (c) the establishment of two farmer representative positions, the "Advisory Council Member" on DFA's Northeast Area Council and the "Farmer Ombudsperson"; (d) a requirement that DFA provide greater financial transparency; (e) the establishment of an Audit Committee for the DFA Board of Directors; and (f) a provision precluding DFA from retaliating against any class member for their participation in litigation or if they decide to cease marketing their milk with DFA. *See generally id.*

241.    Plaintiff and members of the Class reasonably relied on the *Allen* settlement, including the structural reforms contained therein, as evidence that DFA would discontinue their anticompetitive, exclusionary, and predatory conduct in the Northeast raw Grade A milk market.

242.    It was not until this Court ruled on DFA's motion for summary judgment in the *Sitts* action, and the Court disclosed certain of the evidence gathered by the *Sitts* plaintiffs, that Plaintiff and members of the Class could have known that DFA's actual or attempted monopsonization of the Northeast raw Grade A milk market was continuing, undeterred by (and in some cases in violation of) the terms of the *Allen* settlement, the Consent Decree, and DFA's own antitrust policy.

243.    Since learning on September 27, 2019, through this Court's summary judgment order that DFA's anticompetitive activities were ongoing, Plaintiff undertook a thorough investigation, which ultimately led to the filing of this Complaint.

244.    Between the *Allen* parties' submission of their settlement agreement with DFA for approval on May 9, 2016, and September 27, 2019, Plaintiff did not have actual knowledge that DFA's actions in the Northeast were taken with the intent to establish or maintain a monopsony in the raw Grade A milk market.  And it is unreasonable to impute such knowledge to Plaintiff because each of DFA's anticompetitive actions was taken against the backdrop of DFA's public commitments to refrain from anticompetitive conduct in the Northeast Dairy Market and was accompanied by statements from DFA which falsely claimed that such actions were in furtherance of the interests of DFA's members.  Moreover, given that DFA acts as an agent for its member farmers, the "relationship between dairy cooperatives and their members is fiduciary in nature" and gives "rise to an affirmative duty to disclose the true facts and to correct any material factual misstatements."[80]

245.    By virtue of DFA's fraudulent concealment of its wrongful conduct, the running of any statute of limitations was tolled and suspended from May 9, 2016, to September 27, 2019, with respect to any claims and rights of action that Plaintiff and other Class members had as a result of the unlawful monopsony alleged in this Complaint and DFA's predicate acts in furtherance of the same prior to September 27, 2019.

---

[80]    *Allen*, 2014 WL 2610613, at *21.

70

## X.    CONTINUING VIOLATION

246.    The start of DFA's actual or attempted monopsonization of the Northeast market for raw Grade A milk predates the Class Period.

247.    However, DFA was undeterred by the settlements in *Allen* and *Sitts* and has taken further anticompetitive, exclusionary, and predatory actions aimed at establishing or maintaining its monopsony buyer power in the Northeast.

248.    As described above, several of DFA's anticompetitive, exclusionary, and predatory actions and overt acts occurred within the four-year statutory period. Moreover, Plaintiff sold its raw Grade A milk at prices that were artificially suppressed during the four-year statutory period preceding this Complaint as a result of DFA's anticompetitive, exclusionary, and predatory actions. DFA's setting of those prices constituted a new overt act causing injury to the proposed class.

## XI.    CAUSES OF ACTION

### COUNT ONE:
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. §2
#### Monopsony

249.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

251.    The relevant product market is the market for raw Grade A milk, as set forth herein.

252.    The relevant geographic market is the Northeast Dairy Market, as set forth herein. DFA has monopsony power over raw Grade A milk sold in the Northeast Dairy Market. Upon

information and belief, DFA controls 50-60% of the raw Grade A milk produced and sold in the Northeast Dairy Market, as well as controls 85% of fluid milk processing capacity in the Northeast.

253.   DFA possesses monopsony buying power in the Northeast market for raw Grade A milk. DFA acquired and maintains that market power though anticompetitive, exclusionary, and predatory conduct, which DFA intended to have, and did actually have, the effect of: a) foreclosing competition in the market for raw Grade A milk in the Northeast Dairy Market; and b) reducing the price paid to dairy farmers in the Northeast for their raw Grade A milk.

254.   As described in more detail above, DFA's "empire building" campaign in the Northeast Dairy Market centered around using its market power to create a durable low cost/high supply raw Grade A milk paradigm in the Northeast that could not exist absent DFA's market power, consciously designing its business model to thrive in a such an environment, and using a mixture of economic and old-fashioned coercion to bend would-be competitors to its will.

255.   At the cooperative level, DFA's conduct includes, but is not limited to: coercing independent dairy farmers and dairy co-operatives placed under financial distress by DFA's conduct to join DFA; DFA's attempts to use access to milk hauling as a lever to coerce independents and non-DFA co-operatives to join DFA; as well as DFA's attempts to manipulate the FMMO pooling rules in its favor, and failing that, DFA's dissolution of DMS, leaving independent dairy farms without alternative access to market unless they joined DFA.

256.   At the processing level, DFA's anticompetitive conduct was directed at removing alternative outlets for independent dairy farmers to market their raw Grade A milk and increasing DFA's ability to benefit from low raw Grade A milk prices. DFA accomplished this by actually removing alternative outlets through mergers and acquisitions of other raw milk processors, as

72

well as by functionally removing alternative outlets by signing long-term exclusive supply agreements with those raw milk processors.

257.    Critically, all of these actions were taken against the backdrop of a Northeast Dairy Market in serious financial distress due to the low cost/high supply paradigm DFA used its market power to effectuate.

258.    DFA's conduct constitutes unlawful monopsonization in violation of Section 2 of the Sherman Act.

259.    As a direct and proximate result of DFA's continuing violation of Section 2 of the Sherman Act, prices for raw Grade A milk paid to dairy farmers in the Northeast Dairy Market has been and continues to be depressed, fixed, and stabilized, causing injury to Plaintiff and members of the Class.

260.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class would have received for their raw Grade A milk but for DFA's monopsonization, in an amount to be proven at trial.

261.    Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT TWO:
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. §2
## Attempt to Monopsonize

262.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

263.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

264.    The relevant product market is the market for raw Grade A milk, as set forth herein.

265.    The relevant geographic market is the Northeast Dairy Market, as set forth herein. DFA has monopsony power over the purchase of raw Grade A milk in the Northeast Dairy Market. Upon information and belief, DFA controls 50-60% of the raw Grade A milk produced and sold in the Northeast Dairy Market, as well as controls 85% of fluid milk processing capacity in the Northeast.

266.    If DFA does not already have monopsony buying power in the Northeast market for raw Grade A milk, DFA has attempted to monopsonize this market. DFA has attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which DFA intended to have the effect of: a) foreclosing competition in the Northeast raw Grade A milk market; and b) reducing the price paid to dairy farmers in the Northeast for their raw Grade A milk. *See e.g.,* ¶¶255 and 256 above.

267.    As described in more detail above, DFA's "empire building" campaign in the Northeast Dairy Market centered around using its market power to create a durable low cost/high supply raw Grade A milk paradigm in the Northeast that could not exist absent DFA's market power, consciously designing its business model to thrive in a such an environment, and using a mixture of economic and old-fashioned coercion to bend would-be competitors to its will.

268.    Critically, all of DFA's actions were taken against the backdrop of a Northeast Dairy Market in serious financial distress due to the low cost/high supply paradigm, which DFA used its market power to effectuate.

269.    DFA's conduct constitutes unlawful attempted monopsonization in violation of Section 2 of the Sherman Act.

74

270.    As a direct and proximate result of DFA's continuing violation of Section 2 of the Sherman Act, prices for raw Grade A milk paid to dairy farmers in the Northeast Dairy Market has been and continues to be depressed, fixed, and stabilized, causing injury to Plaintiff and members of the Class.

271.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class would have received for their raw Grade A milk but for DFA's attempted monopsonization, in an amount to be proven at trial.

272.    Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## XII.    REQUEST FOR RELIEF

273.    WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against DFA as follows:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      The unlawful monopsony alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act;

C.      Plaintiff and the Class recover damages, to the maximum extent allowed under the Sherman Act, and that a judgment in favor of Plaintiff and the members of the Class be entered against DFA in an amount to be trebled;

D.      DFA, its affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, and/or monopsony alleged herein, and/or from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      DFA, its affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with DFA, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing its monopsony;

F.      Plaintiff and the members of the Class be awarded pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**XIII.   JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: July 27, 2022                         **MCVEIGH SKIFF ATTORNEYS AT LAW**

/s/

Chris McVeigh
William B. Skiff
30 Elmwood Avenue
Burlington, VT 05401
Telephone: (802) 660-2466

76

chris@mcveighskiff.com
bill@mcveighskiff.com

W. Joseph Bruckner (*pro hac vice* forthcoming)
Brian D. Clark (*pro hac vice* forthcoming)
Stephen J. Teti (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
sjteti@locklaw.com

Steve W. Berman (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com

Elaine T. Byszewski (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile:  (213) 330-7152
elaine@hbsslaw.com

David R. Scott (*pro hac vice* forthcoming)
Patrick J. McGahan *pro hac vice* forthcoming)
Michael P. Srodoski (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 Main Street
P.O. Box 192
Colchester, CT 06415

Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Christopher M. Burke (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
cburke@scott-scott.com

Thomas Boardman (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tboardman@scott-scott.com

*Attorneys for Plaintiff*